72 Mass. App. Ct. 549 (2008)                    549

Thomas O'Connor Constructors, Inc. v. Massachusetts Commission Against Discrimination.

THOMAS O'CONNOR CONSTRUCTORS, INC. *vs.* MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION & another.[1]

No. 07-P-831.

Norfolk. March 3, 2008. - September 9, 2008.

Present: GRASSO, ARMSTRONG, & RUBIN, JJ.

*Anti-Discrimination Law,* Employment, Race. *Employment,* Discrimination. *Massachusetts Commission Against Discrimination. Damages,* Emotional distress. *Emotional Distress.*

This court concluded that an employer who was on notice of unlawful discriminatory acts by its supervisor, directed toward an employee of a subcontractor at a unitary work site, and who failed to take reasonably adequate remedial action was liable under G. L. c. 151B, § 4(4A); further, this court declined to resolve the contours of an employer's derivative liability under § 4(4A) for acts of discrimination directed at nonemployees by its own personnel without regard to the employer's awareness of those acts. [554-560] RUBIN, J., concurring in the judgment and dissenting in part.

In the circumstances of an action for employment discrimination based on race, the repeated, offensive, and racist remarks of the job site superintendent of a general contractor were sufficiently severe or pervasive to create a hostile work environment for the plaintiff, an African-American employee of a subcontractor and, without any remedial action by the general contractor upon learning of the conduct, permitted recovery against that entity. [560-561]

A Superior Court judge properly determined that the record in an employment discrimination action supported the Massachusetts Commission Against Discrimination's award of emotional distress damages to the plaintiff. [561]

CIVIL ACTION commenced in the Superior Court Department on March 3, 2006.

The case was heard by *Charles J. Hely,* J.

*James F. Grosso* for the plaintiff.

*Beverly I. Ward* for the defendant.

[1]Jarvis Aldridge, intervener.

*Mitchell S. Possick,* for the intervener, was present but did not argue.

GRASSO, J. Thomas O'Connor Constructors, Inc. (O'Connor), appeals from a judgment of the Superior Court affirming a decision and order of the Massachusetts Commission Against Discrimination (MCAD) on a claim brought by Jarvis Aldridge, an African-American employee of Rustic Fire Protection (Rustic). The MCAD ordered O'Connor to pay Aldridge $50,000 in emotional distress damages on account of offensive racial remarks made to or about Aldridge on four different occasions by Paul Daley, O'Connor's job site superintendent. The MCAD also ordered O'Connor to pay a $10,000 civil penalty and to conduct annual training sessions for a period of five years.

On appeal, O'Connor asserts that (1) imposition of liability on O'Connor under G. L. c. 151B, § 4(4A), for the racially offensive remarks of Daley, is error where no employment relationship existed between O'Connor and Aldridge and O'Connor neither knew nor had reason to know of Daley's remarks; (2) Daley's remarks were insufficiently severe and pervasive to create a racially hostile work environment; and (3) the evidence was insufficient to support an award of emotional distress damages. We affirm, albeit on grounds different from those relied on by the MCAD. We conclude that O'Connor is directly liable for tolerating the hostile work environment created by Daley where it had notice of Aldridge's claim but failed to remedy or take sufficient corrective action and, instead, returned Daley to supervise the work site.

1. *Background.* On December 7, 1998, Aldridge filed a complaint with the MCAD against O'Connor claiming that he was an employee of O'Connor and that Daley, a supervisor, had engaged in unlawful discrimination on the basis of race and color in violation of G. L. c. 151B, § 4(1). The alleged unlawful discrimination consisted of Daley's use of racial epithets when talking with or about Aldridge.

A hearing officer concluded that Daley made the racially offensive remarks alleged; that Aldridge was not the employee of O'Connor, but of Rustic; and that notwithstanding the absence of an employment relationship with Aldridge or liability under § 4(1), O'Connor was liable under G. L. c. 151B, § 4(4A), on

account of Daley's interference with Aldridge's right to a non-hostile work environment. The hearing officer awarded Aldridge $25,000 in emotional distress damages[2] and ordered O'Connor to pay a $10,000 civil penalty and to conduct annual training sessions for all of its employees, managers, and supervisors for a period of five years. On review, the MCAD affirmed the hearing officer's findings of fact and conclusions of law, but deemed the award of emotional distress damages inadequate and vacated it. The MCAD also modified the annual training order by limiting its application to managers and supervisors. On remand, the hearing officer awarded $50,000 to Aldridge for emotional distress damages and the MCAD affirmed. A judge of the Superior Court affirmed the MCAD decision and order and this appeal followed.

2. *Facts.* We summarize the facts found by the hearing officer. O'Connor was the general contractor on a project for renovation of two buildings at the University of Massachusetts at Lowell (UMass-Lowell). Rustic was a subcontractor at the project, responsible for installation of a new sprinkler and fire protection system. Besides Rustic, two other subcontractors worked on the project.

Daley, who was the job site superintendent, served as O'Connor's chief spokesperson and authority at the project. His responsibilities entailed overseeing of the work of the subcontractors, including coordinating and assisting in scheduling of the work. Daley unlocked and opened doors to various areas of the job site, and occasionally gave keys to the subcontractors and their employees, including Aldridge.

Daley did not assign work to Rustic's employees, order supplies on their behalf, supervise them, or tell them what to do. Ron Russell, Rustic's foreman, directly supervised and provided materials to Rustic's employees, including Aldridge. When Russell was on vacation, Aldridge served as acting supervisor. Aldridge received compensation only from Rustic for his work on the project.

From November 27, 1997, until the end of August, 1998, Da-

---

[2]Because Aldridge failed to submit any credible evidence of lost wages and did not argue that he was constructively discharged, the hearing officer did not award any back pay.

ley and Aldridge interacted without difficulty. Thereafter, on four separate occasions, Daley made racially offensive remarks to or about Aldridge or James Lucas, an African-American who worked for O'Connor as a laborer. Specifically, on August 27, 1998, in the presence of Russell and Aldridge, Daley referred to Lucas as a "fucking dumb nigger." When Aldridge asked Daley if he knew what the word meant, Daley responded, "It's a phrase used in the Holocaust with reference to Jews." Upon being told that the slur referred to "black people," Daley laughed.

A few weeks later, on September 21, in the presence of Aldridge alone, Daley again referred to Lucas as a "fucking dumb nigger." Aldridge turned and walked away. The next day, during the lunch break and following a conversation about sports, Daley referred to Aldridge as a "black bastard" in the presence of Russell and other pipefitters. Although angered by the remark, Aldridge did not respond.

Finally, on September 24, 1998, while Daley and Russell were driving to New Hampshire, Daley complained to Russell that Aldridge reaped the benefits of a prevailing wage job because he is a "fucking nigger." On returning to the job site, Russell told Aldridge of Daley's remark. Aldridge became visibly upset. Russell also told Rustic's project manager, Chad Duboc, of Daley's comments. Aldridge informed John Duboc, Rustic's owner, about Daley's remarks and requested that he (Aldridge) be removed from the work site. John Duboc told Aldridge that Rustic needed him at the project and denied his request to work elsewhere.

Aldridge wrote a letter, dated September 30, 1998, and addressed "To Whom It May Concern," detailing the four incidents. He gave the letter to Lucas and then to a union business agent in the hope that the letter would find its way to O'Connor, which it did.

Joseph Vogel was O'Connor's project manager for the UMass-Lowell project. Vogel visited the work site one or two times per week. In October, 1998, upon hearing that Daley had made racial comments to Aldridge, Vogel went to the work site and asked Aldridge, "Jarvis, what's going on?" Aldridge responded angrily, "There's nothing wrong with being a black man." Aldridge told Vogel that he should "read the letter" and that he

(Aldridge) would be pressing charges against O'Connor. Vogel told Aldridge that he would "get to the bottom of it."

Daley was away on his honeymoon when Vogel began his investigation. When Daley returned, Vogel told him not to report to the job site. On October 19, Vogel and other O'Connor officials met with Daley to discuss the charges. Daley adamantly denied making any racial slurs. Vogel then spoke with Russell and with Lucas, one of O'Connor's own employees. Russell corroborated Aldridge's account, advising Vogel that he would "back his man." Lucas denied ever being directly subjected to discrimination in any form by Daley; but when O'Connor presented Lucas with a written statement to that effect, Lucas refused to sign the document.

O'Connor concluded its investigation without again speaking with Aldridge, without disciplining Daley, and without notifying Aldridge of the results of its investigation or that Daley would be returned to the work site. In its internal investigation summary, O'Connor took the position that "[s]ince the specific situation is not known at this time, we will wait until a 'claim' is actually in house and review before taking action. (The term claim in house is referencing an 'official action' generated against O'Connor . . . — this might not happen at all)." O'Connor reassigned Daley to the project job site. Daley had been off the site for two weeks while on his honeymoon and an additional two weeks while the matter was investigated. Upon seeing Daley back at the job site, Aldridge packed up his tools and left work that, in his words, he loved — a job with "good money" and at which he worked with "good people" — because he could no longer tolerate working there while Daley was present.

The hearing officer credited the testimony of Aldridge and his wife that at the time of the racial remarks, Aldridge began coming home from work very disturbed and angry. He confided to his wife that his attitude was in response to Daley's racial slurs. Aldridge experienced physical manifestations of distress. He lost weight and had difficulty sleeping. He became withdrawn and isolated; he stopped playing with his children, ceased communicating with his wife, and locked himself in his room to avoid contact with them. Aldridge's outlook improved temporarily when Daley was away, but the withdrawn behavior returned when Daley returned to the job site.

3. *Liability of O'Connor.* The working arrangement that serves as backdrop to the present claim is commonplace in large construction projects where a general contractor and specialized subcontractors interact at a common work site. Aldridge's claim is unusual, however, in that he sought recovery not against Rustic, his employer,[3] or even against Daley, the perpetrator, but against O'Connor, the general contractor, on account of Daley's racially offensive remarks.

The MCAD did not rest its decision on G. L. c. 151B, § 4(1), under which Aldridge brought his claim.[4] The hearing officer found, and the parties do not challenge, that Aldridge was an employee of Rustic, but not of O'Connor.[5] Absent such an employment relationship, the MCAD concluded that O'Connor could not be liable to Aldridge under § 4(1), either directly or derivatively, for the acts of its supervisor, Daley.

Instead, the MCAD ruled that O'Connor was liable to Aldridge under G. L. c. 151B, § 4(4A), inserted by St. 1989, c. 722, § 14, which makes it an unlawful practice:

> "For any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter . . . ."

Guided by one of its decisions[6] that imposed liability on a

[3]Aldridge filed a complaint against Rustic, but the MCAD found no probable cause on that claim. We express no opinion on the correctness of that determination. But see *Modern Continental/Obayashi* v. *Massachusetts Commn. Against Discrimination*, 445 Mass. 96, 108 (2005) ("employer may be held liable for failing to respond reasonably to [prohibited acts] of which it is aware or reasonably should be aware, even though the harassing acts are perpetrated by someone who is not an agent or employee of the employer").

[4]General Laws c. 151B, § 4(1), as appearing in St. 1989, c. 516, § 4, makes it an unlawful practice "[f]or an employer, by himself or his agent, because of the race, color, . . . or ancestry of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . ."

[5]The hearing officer concluded that Aldridge failed to establish that O'Connor exercised sufficient control over his employment to be deemed a joint employer where O'Connor neither paid Aldridge nor controlled the manner in which he performed his work.

[6]The MCAD relied on *Erewa* v. *Reis*, 20 M.D.L.R. 36, 38 (1998), which

direct perpetrator[7] of discrimination not part of the employment unit, the MCAD interpreted G. L. c. 151B, § 4(4A), so as to make O'Connor liable for Daley's actions regardless of its knowledge. See *Modern Continental/Obayashi* v. *Massachusetts Commn. Against Discrimination*, 445 Mass. 96, 105 (2005) (*Modern Continental*) (statute to be interpreted liberally to effectuate purpose of eliminating workplace discrimination). The MCAD reasoned that O'Connor and Aldridge were "person[s]" as defined in G. L. c. 151B, § 1(1), inserted by St. 1946, c. 368, § 4, and that the right to work in an environment free from unlawful racial harassment is among the rights encompassed by the statute. Moreover, relying on *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination*, 400 Mass. 156, 163-167 (1987) (*College-Town*) (employer liable under § 4[1] for intentional acts of its supervisory personnel regardless of its notice of those acts), it concluded that O'Connor could be held liable under § 4(4A) for the acts of Daley regardless of its knowledge of those acts.

We agree with the MCAD that O'Connor could not be liable to Aldridge under § 4(1) because there was no employment relationship between O'Connor and Aldridge.[8] Indeed, no Mas-

___

found a third party who was not part of the employment unit liable for discrimination against the employee of an employer that was not cited.

[7]The hearing officer opined that the evidence supported a claim of individual liability against Daley under § 4(4A), although Aldridge had failed to name Daley as an individual respondent. See *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 492 (2000) (individual perpetrator can be held individually liable under G. L. c. 151B for sexual harassment of coworker).

[8]We respectfully disagree with the concurrence that O'Connor is liable to Aldridge under § 4(1). Characterizing Aldridge's claim a so-called "interference" claim encompassed within the plain language of § 4(1) begs the question whether O'Connor is a "covered employer" vis-à-vis Aldridge within the meaning of that section. That Daley scheduled work, unlocked and opened doors, and occasionally gave keys to subcontractors does not transform O'Connor into Aldridge's employer — either directly or indirectly. Indeed, the Federal cases on which the concurrence relies to posit § 4(1) liability are inapposite, *post* at 563 nn.3, 4. Under the common-law agency test, no direct employer-employee relationship exists between O'Connor and Aldridge because O'Connor did not control the "means and manner" of Aldridge's performance or supervise Aldridge's work on the site. See *Moland* v. *Bil-Mar Foods*, 994 F. Supp. 1061, 1068-1071 (N.D. Iowa 1998) (employer's right to control "means and manner" of worker's performance is most important factor to consider). ·

Nor do *Sibley Memorial Hosp.* v. *Wilson*, 488 F.2d 1338 (D.C. Cir. 1973),

sachusetts appellate decision ever has interpreted § 4(1) to apply to an action brought by or against someone outside the employment unit. See *Modern Continental*, 445 Mass. at 97, 105 (declining to read G. L. c. 151B in manner that would absolve *employer* of all responsibility to *its* own employee for hostile work environment attributable to actions of subcontractor).

We also agree with the MCAD that O'Connor, the general contractor, is liable to Aldridge, the employee of a subcontractor at the work site, under § 4(4A). Where on the present facts we conclude that O'Connor is liable to Aldridge for failing to remedy a racially hostile work environment of which it had notice, we need not resolve the more difficult question whether O'Connor could be liable under § 4(4A) solely on account of Daley's remarks without regard to its awareness of those remarks.[9]

Although no Massachusetts appellate decision ever has interpreted § 4(4A) to make an employer liable to someone other than its employee, the statutory language admits of such a result.[10] General Laws c. 151B, § 4(4A), makes it unlawful for "any person" to "coerce, intimidate, threaten, or interfere with another

and its progeny, on which the concurrence places such emphasis, establish an indirect employer-employee relationship between O'Connor and Aldridge for purposes of § 4(1) liability. The *Sibley* line of cases, which has "realized widespread attention, though not universal acceptance" by Federal courts, see *Moland* v. *Bil-Mar Foods, supra* at 1072, operates within the limited circumstance where an employer that controls access to the job market and job opportunities denies a claimant the opportunity to work because of discriminatory practices. See *id.* at 1071-1072, and cases cited. Where an employer controls access to the job market and denies that access to an individual based on unlawful criteria, an employment relationship is deemed to exist even though the claimant is someone else's employee. Even were we to accept the *Sibley* rationale as applicable to claims brought under § 4(1), no such denial of access to the job market or job opportunities is present in this case.

[9]While neither the MCAD nor the Superior Court judge predicated O'Connor's liability on this narrower ground, "we may affirm the lower court's judgment on any ground supporting it." *National Lumber Co.* v. *Canton Inst. for Sav.*, 56 Mass. App. Ct. 186, 187 n.3 (2002).

[10]Indeed, interpreted literally, the scope of § 4(4A) is almost without limit and might render redundant many of the individual provisions of G. L. c. 151B, § 4, that outlaw discrimination in particular contexts including the core protection against discrimination in employment afforded by § 4(1). For present purposes, we need not resolve that uncertainty.

person" in the exercise or enjoyment of rights granted under the chapter. O'Connor, Aldridge, and Daley are all "persons" as defined in G. L. c. 151B, § 1(1), and the right to work in an environment free from unlawful racial harassment is unquestionably among the rights encompassed by the statute.[11]

In our view, the present problem lies in the application of § 4(4A) not to acts of which O'Connor was aware but to acts of O'Connor's employees of which O'Connor was not aware. We acknowledge that, generally speaking, a corporation is a legal entity that must act through agents and employees. Nevertheless, we are concerned that broad application of this principle in the context of § 4(4A) could produce untoward results not contemplated by either the language or the intent of that subsection.

Unlike the language of § 4(1), as appearing in St. 1989, c. 516, § 4, which contemplates derivative liability by making it unlawful for "an employer, by himself or his agent," to engage in discriminatory practices, the language of § 4(4A), by contrast, omits any reference to agents and speaks only to the direct liability of a "person." Nor does the tort doctrine of respondeat superior dictate vicarious liability under § 4(4A). "[R]espondeat superior is the proposition that an employer, or master, should be held vicariously liable for the *torts* of its employee, or servant, committed within the *scope of employment*" (emphasis supplied). *Dias* v. *Brigham Med. Assocs.*, 438 Mass. 317, 319-320 (2002). See *Kavanagh* v. *Trustees of Boston Univ.*, 440 Mass. 195, 198 (2003). A discrimination action under G. L. c. 151B is, however, a statutorily created right, not a common-law tort. See *Jancey* v. *School Comm. of Everett*, 421 Mass. 482, 500-501 (1995) (despite historical connection statute prohibiting discrimination

---

[11]To date, the few of our appellate decisions that have discussed § 4(4A) have considered it an adjunct to § 4(4), which is directed primarily at prohibiting retaliation for exercise of rights protected by the chapter. See *Pontremoli* v. *Spaulding Rehabilitation Hosp.*, 51 Mass. App. Ct. 622, 624-625 (2001) (interpreting § 4[4A] in conjunction with § 4 prohibitions against wrongful discharge as confined to a "retaliation claim"); *King* v. *Boston*, 71 Mass. App. Ct. 460, 473 (2008) (sections 4[4] and 4[4A], read separately or together, essentially proscribe retaliation against those who exercise their rights under G. L. c. 151B and against those who assist or advocate for them). See also *Bain* v. *Springfield*, 424 Mass. 758, 765 (1997).

We discern no such limitation in the literal language of the statute.

may have with common-law tort or contract claims, "acts of discrimination — whether intentional or unintentional — do not thereby become torts").

That principles of vicarious liability operate differently, and that caution is in order in applying such principles throughout the various subsections of G. L. c. 151B, § 4, is evident from *College-Town*, 400 Mass. at 163-167. There, the court considered the scope of an employer's vicarious liability under § 4(1) for discrimination in the workplace arising from the acts of its agent. Taking note that language of § 4(1) "prohibits discrimination by 'an employer, by himself or his agent,' " the court concluded that the Legislature had made clear its intent to impose vicarious liability under that section. *Id.* at 165, quoting from G. L. c. 151B, § 4. "It is clear that the Legislature intended that an employer be liable for discrimination committed by those on whom it confers authority." *College-Town, supra.* Guided by the Legislature's expressed intent, and without resolving the extent to which "G. L. c. 151B, § [4(1)], imposes an affirmative obligation on an employer to ensure that its workplace is not pervaded by harassment based on race, color, religious creed, national origin, sex, or ancestry, regardless of [its] source," the court held that the employer was "vicariously liable for the acts of its agents — its supervisory personnel." *Ibid.*

Significantly, in our view, *College-Town* limited the employer's vicarious liability under § 4(1) to the acts of its supervisory personnel, not those of all of its workers, as would have been the case in a common-law tort. We note, as well, that the considerations relied on in *College-Town* for holding an employer vicariously liable under § 4(1) for its supervisor's discriminatory actions either do not exist, or exist with diminished force in the context of a claim under § 4(4A) by a person like Aldridge who is not part of the employment unit. When the claimant is not part of the employment unit, the supervisor does not exercise direct supervisory authority over him. Nor does harassment by the supervisor carry the same implied threat of punishing resistance through exercise of supervisory powers as exists within the employment unit. See *id.* at 165-166. Likewise absent is the concern regarding the anomaly that a notice requirement creates when the perpetrator is also the supervisor to whom notice would be given by an

employee. See *id.* at 166-167. When the claimant is not part of the employment unit, no chain of command considerations restrict his ability to notify those with the ability to rectify the problem. Indeed, as was done here, he is free, if not obliged, first to approach *his own* employer, which has an obligation to protect its employee, whether by notifying the perpetrator's employer or by removing the claimant from the situation should notification or other protective measures prove unsuccessful. See *Modern Continental*, 445 Mass. at 108-109.[12] Likewise, as was done here, the claimant is free to provide notice of the discrimination to those in the corporate hierarchy of the perpetrator's employer and seek protection from them.

We are concerned that application of principles of vicarious liability enunciated in *College-Town* for a claim under § 4(1), to a claim under § 4(4A), would render an employer strictly and immediately liable for discrimination directed at nonemployees that it had no opportunity to control. Such liability would arise regardless of the employer's knowledge of the discrimination, regardless of the remedial steps taken upon learning of the discrimination, and regardless even of the existence of strong preventive programs already in place to combat discrimination in the workplace. Such a broad application of derivative liability in the context of § 4(4A) could render an employer liable to a broad spectrum of third-party nonemployees, including subcontractors, delivery persons, and canteen workers who conduct their business on the employer's work site.

Without need to do so, we are hesitant to resolve the difficult, uncertain, and potentially limitless contours of an employer's derivative liability under § 4(4A) for acts of its own personnel of which it is unaware.[13] We need not do so here where O'Connor is liable to Aldridge under § 4(4A) directly for its failure to

---

[12]The claim here is similar, but not identical, to that in *Modern Continental*. There, an employee of a general contractor brought a claim against *her* employer on account of actions of an employee of a subcontractor. Here, an employee of a subcontractor brought a claim against the general contractor on account of actions of the general contractor's employee, i.e., its site supervisor.

The claim in *Modern Continental* that would have been analogous to Aldridge's, a claim against a nonemployer for the acts of its agents, settled without a determination of liability. See *Modern Continental, supra* at 97.

[13]We are reluctant to gloss over these problems by simply labeling Daley a

remedy a racially hostile work environment of which it had notice. "An employer who passively tolerates the creation of a hostile working environment implicitly ratifies the perpetrator's misconduct and thereby encourages the perpetrator to persist in such misconduct, whatever the employer's precise legal relationship to the perpetrator." *Modern Continental,* 445 Mass. at 105. See *College-Town,* 400 Mass. at 167-168 (employer that fails to take remedial action after notification of harassment is liable therefor).

Having commenced an investigation into Aldridge's allegations against Daley and corroborated the existence of at least those comments made in the presence of Russell, O'Connor failed to take the remedial steps that would discipline Daley and assure Aldridge that his concerns had been heard and that Daley's behaviors would not be tolerated. Instead, O'Connor returned Daley to his job as work site superintendent. Such apparent inaction led directly, and reasonably predictably, to Aldridge's leaving the work that he loved at considerable emotional cost. In such circumstances, we hold that an employer who is on notice of unlawful discriminatory acts by its supervisor, directed toward an employee of a subcontractor at a unitary work site, and fails to take reasonably adequate remedial action is liable under G. L. c. 151B, § 4(4A).

4. *The severity and pervasiveness of the hostile work environment.* We need not dwell long on O'Connor's contention that there was insufficient proof that Daley's conduct created a racially hostile work environment. Daley's repeated, offensive, racist remarks were sufficiently severe or pervasive to create a hostile work environment. See *Gnerre* v. *Massachusetts Commn. Against Discrimination,* 402 Mass. 502, 508-509 (1988); *Muzzy* v. *Cahillane Motors, Inc.,* 434 Mass. 409, 411 (2001); *Cuddyer* v. *The Stop & Shop Supermarket Co.,* 434 Mass. 521, 522 (2001).

"supervisor" and concluding that the label makes O'Connor liable for his discriminatory acts. Daley was a supervisor of O'Connor's job site in the sense that he directed the access to the site and the timing of the work of the various subcontractors, including Rustic, Aldridge's employer. He was not a supervisor in the sense that he directed the work of the subcontractor's employees or, in the sense vital to the reasoning of *College-Town,* of having chain-of-command responsibility for job assignment, job grievances, or job discipline.

Daley's remarks intimidated, humiliated, and stigmatized Aldridge and other workers of his race in such a way as to pose a "formidable barrier to the full participation of an individual in the workplace." *College-Town*, 400 Mass. at 162. A workplace at which the job site superintendent of a general contractor repeatedly refers to African-American employees of subcontractors at the work site with epithets such as those employed by Daley and at which the general contractor, upon learning, fails to take appropriate remedial action creates a racially hostile work environment that is sufficiently severe and pervasive as to permit recovery.

5. *The emotional distress damages award.* The award of emotional distress damages fully was supported by the record. See *Stonehill College* v. *Massachusetts Commn. Against Discrimination*, 441 Mass. 549, 576 (2004) (emotional distress damage award must be supported by "substantial evidence" and factual basis must be "made clear on the record"). Substantial evidence supports the hearing officer's findings and conclusion that Aldridge suffered emotional distress, lost weight and had difficulty sleeping as a result of the racially hostile work environment. Aldridge came home from work very disturbed and angry as a result of Daley's racial slurs. He experienced physical manifestations of distress, became withdrawn and isolated, stopped playing with his children, and ceased communicating with his wife. Such evidence was sufficient to support the determination that Aldridge suffered emotional distress and was compelled to curtail his life's activities as a result of the unlawful discrimination. See *ibid.* The award of emotional distress damages and the other remedial action ordered was within appropriate bounds. See *DeRoche* v. *Massachusetts Commn. Against Discrimination*, 447 Mass. 1, 9 (2006).

*Judgment affirmed.*

RUBIN, J. (concurring in the judgment and dissenting in part). I agree with the court's affirmance of the judgment of the Superior Court. I conclude, however, that Thomas O'Connor Constructors, Inc. (O'Connor), is liable under the ordinary and long-standing rule in this Commonwealth that an employer is li-

able for the discriminatory acts of its supervisory personnel. O'Connor was thus liable independent of and prior to O'Connor's failures of investigation and remediation. See *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination*, 400 Mass. 156 (1987) (*College-Town*). The question whether O'Connor is vicariously liable for its supervisor's actions must be addressed in order to resolve this case: the Massachusetts Commission Against Discrimination (commission) found for Jarvis Aldridge on the basis that O'Connor was vicariously liable for the conduct of Paul Daley. The damages award under review includes compensation for emotional distress, some of which is described by the majority, that began well before the notice and failure to take corrective action on which the majority relies.

The claim by Aldridge against O'Connor is what is known as an "interference" claim — a claim that an individual or entity covered by statute has discriminatorily interfered with a complainant's hiring, continued employment, promotion, or compensation by, or with other terms, conditions or privileges of his or her employment with, a third-party employer. I agree with the majority that such a claim may be brought under G. L. c. 151B, § 4. Contrary to the majority, however, I believe that an interference claim is provided for in this case by the plain language of both G. L. c. 151B, § 4(1), and G. L. c. 151B, § 4(4A).

Section 4(1), as appearing in St. 1989, c. 516, § 4, prohibits a covered "employer" from discriminating on the basis of race or color against "any individual" with respect to the "terms, conditions or privileges of employment" not just its own employees or potential employees. O'Connor is a covered employer under c. 151B.[1]

Identical language in the Federal antidiscrimination statute, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (2006), has been virtually uniformly construed over the past thirty-five years to provide for an interference claim, starting with Judge McGowan's decision for the United States Court of Appeals for the District of Columbia Circuit in 1973 in *Sib-*

---

[1] Under G. L. c. 151B, "employer" is defined as any "employer" with six or more "persons in his employ." G. L. c. 151B, § 1, inserted by St. 1946, c. 368, § 4.

*ley Memorial Hosp.* v. *Wilson,* 488 F.2d 1338 (D.C. Cir. 1973). The *Sibley* court concluded that the words "any individual" should be given their ordinary meaning, and said that "[t]o permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited." *Id.* at 1341.[2]

*Sibley* has been followed by all the Federal courts of appeals to consider the issue.[3] Federal courts, applying *Sibley* and the decisions following it, have entertained interference claims alleging not only discrimination with respect to hiring, but claims like the instant one alleging a hostile work environment.[4] The reasoning of *Sibley,* while not binding on us, see *College-Town,*

---

[2]*Sibley* and its progeny do not, as the majority asserts, deem that in such circumstances an employment relationship exists. *Ante* at 555 n.8. As the language quoted in the text makes clear, those decisions impose liability in the absence of an employment relationship between the claimant and the defendant. See also, e.g., *Moland* v. *Bil-Mar Foods,* 994 F. Supp. 1061, 1073 (N.D. Iowa 1998) (*Sibley* line of cases imposes liability "even though the individual is not an employee of [the defendant] employer"). As the majority notes, the parties do not challenge the hearing officer's finding that Aldridge was not an employee of O'Connor.

[3]See, e.g., *Pardazi* v. *Cullman Med. Center,* 838 F.2d 1155, 1156 (11th Cir. 1988); *Christopher* v. *Stouder Memorial Hosp.,* 936 F.2d 870, 875-877 (6th Cir. 1991); *Association of Mexican-Am. Educators* v. *California,* 231 F.3d 572, 580-581 (9th Cir. 2000). See also *Bender* v. *Suburban Hosp., Inc.,* 159 F.3d 186, 188-189 (4th Cir. 1998) (noting that at the time of the decision, "Every Court of Appeals to consider" the issue "whether Title VII allows indirect liability for an employer's interference with an individual's employment with third parties" had "followed the lead of the District of Columbia Circuit in allowing such a claim"). Only the United States Court of Appeals for the Second Circuit has rejected *Sibley* in any context, see *Gulino* v. *New York State Educ. Dept.,* 460 F.3d 361, 374-376 (2d Cir. 2006), and a subsequent decision of that court makes clear that whether *"Gulino* closed the door entirely on the *Sibley* theory of interference liability in [the Second] Circuit" remains an open question. *Salamon* v. *Our Lady of Victory Hosp.,* 514 F.3d 217, 233 (2d Cir. 2008).

[4]See, e.g., *Diana* v. *Schlosser,* 20 F. Supp. 2d 348, 352-353 (D. Conn. 1998) (radio station subject to liability for hostile work environment harassment of employee of third party on-air traffic reporting business); *Moland* v. *Bil-Mar Foods,* 994 F. Supp. 1061, 1072-1073 (N.D. Iowa 1998) (defendant could face liability for hostile work environment at its plant which affected former employee of third party trucking company who was harassed while

400 Mass. at 163, is persuasive. Under that reasoning, § 4(1) provides for an interference claim against O'Connor.

Further, as the majority holds, G. L. c. 151B, § 4(4A), added to § 4 in 1989, see St. 1989, c. 722, § 14, independently and explicitly provides for an interference claim, not merely against employers, but against all "person[s]," defined by the statute to "include[] one or more individuals, partnerships, associations, [and] corporations . . . ." G. L. c. 151B, § 1, inserted by St. 1946, c. 368, § 4.[5] And, indeed, the commission has, for more than a decade, construed § 4(4A) to recognize an interference claim brought against one who is not the complainant's employer. See *Erewa* v. *Reis*, 20 M.D.L.R. 36, 38 (1998). In its capacity as a corporation, then, O'Connor is independently subject to an interference liability claim.[6]

As for O'Connor's liability for the actions of Daley, it is the long-established rule in our Commonwealth that an employer is responsible for the discriminatory acts of its supervisory personnel. See *College-Town, supra* at 156.[7] Daley was clearly in the category of supervisory personnel. He was O'Connor's

---

assigned to work there); *King* v. *Chrysler Corp.*, 812 F. Supp. 151, 153-154 (E.D. Mo. 1993) (employee of cafeteria operated on Chrysler premises can bring hostile work environment claim against Chrysler even though it was not her direct employer).

[5]Section 4(4A), inserted by St. 1989, c. 722, § 14, which has no cognate Federal provision, provides that it shall be an unlawful practice:

> "For any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter."

[6]That two sections of our antidiscrimination law should have overlapping coverage is unremarkable. Compare, e.g., G. L. c. 151B, § 4(1) (making it unlawful for an employer to discriminate against an individual on the basis of sex with respect to the terms, conditions, or privileges of employment), with G. L. c. 151B, § 4(16A) (making it unlawful for an employer to sexually harass an employee).

[7]Contrary to the assertion by the majority, *ante* at 558, *College-Town* did not "limit[] the employer's vicarious liability under § 4(1) to the acts of its supervisory personnel." It left open the question (not at issue here) of vicarious liability for the acts of employees below the supervisory level. See *College-Town, supra* at 165.

chief spokesperson and authority at the project. Daley's job as a supervisor entailed control over and maintenance of the very work environment at issue in this case. Not only did his responsibilities for O'Connor include oversight of all the work of all the subcontractors at the job site, he controlled the physical environment in which the work there, including Aldridge's, was undertaken, having control of the keys and locking and opening doors to various areas of the job site.

*College-Town* imposes vicarious liability upon employers under § 4(1) for the acts of supervisory personnel.[8] I also agree with the commission — to whose reasonable interpretation of the statute we owe deference[9] — that the ordinary rule of vicarious liability articulated under *College-Town* applies under § 4(4A). The majority suggests that *College-Town* does not apply to § 4(4A) because the language of § 4(4A) is not precisely the same as that in § 4(1). Section 4(1) imposes liability for acts of "an employer, by himself or his agent," — e.g., a supervisor — whereas § 4(4A) imposes liability for acts of "any person." In the present context this is a distinction without a difference. "Person" is defined to include "corporations," which is the capacity in which O'Connor is subject to liability under § 4(4A). The word "corporation" does not need additional verbiage to clarify that a corporation may be liable for the acts of its agents. "A corporation is a creature of the law, a 'separate and distinct legal entity . . . [that] can only act through its agents.' Its liability is 'necessarily vicarious.' That corporations may be vicariously liable for the acts of their agents is axiomatic." *Sarvis* v. *Boston Safe Deposit & Trust Co.*, 47 Mass. App. Ct. 86, 96 (1999) (citations omitted). Under *College-Town*, principles of respondeat superior were applied to impose liability because "the authority conferred upon a supervisor by the employer" gave the supervisor the particular ability to create a discriminatorily hostile work environment. See *id.* at 166. Where a supervisor acting within the scope of his or her employment discriminatorily interferes with

---

[8]While the Superior Court judge did not address § 4(1), as the majority notes, "we may affirm the lower court's judgment on any ground supporting it," *National Lumber Co.* v. *Canton Inst. for Sav.*, 56 Mass. App. Ct. 186, 187 n.3 (2002).

[9]See *Knight* v. *Avon Prod., Inc.*, 438 Mass. 413, 425 n.8 (2003); *Buchanan* v. *Contributory Retirement Appeal Bd.*, 65 Mass. App. Ct. 244, 246 (2005).

employment with a third party in violation of § 4(4A), that circumstance also exists.[10] And indeed, in *Sarvis* v. *Boston Safe Deposit & Trust Co.*, 47 Mass. App. Ct. 86, 94-97 (1999), we construed language from the Massachusetts Civil Rights Act essentially identical to that in § 4(4A), utilized by the Legislature in a similar remedial context, to impose ordinary principles of respondeat superior liability. Accord G. L. c. 151B, § 9, as appearing in St. 2002, c. 223, § 2 (instructing that c. 151B "shall be construed liberally for the accomplishment of its purposes").[11]

[10]The majority says that "[w]hen the claimant is not part of the employment unit, the supervisor does not exercise direct supervisory authority over him." *Ante* at 558. But in a case like this where a general contractor hires subcontractors to assist with its own project, taking place in a unitary work site, the general contractor's supervisor does exercise supervisory authority over the workplace environment of the employees of the subcontractor, and it is that authority that provides him or her with the ability to render that environment discriminatorily hostile. The majority also notes that harassment by O'Connor's supervisor does not carry "the same implied threat of punishing resistance through exercise of supervisory powers as exists within the employment unit." *Ibid.*, citing *College-Town*, 400 Mass. at 165-166. The *College-Town* court referred to that factor as part of its explanation for rejecting the defendant's claim that "the authority conferred on a supervisor is not related to the creation of a sexually harassing environment." *College-Town*, 400 Mass. at 165. *College-Town* involved sexual harassment, including a request by the supervisor that he and the complainant "get[] together." *Id.* at 158. The point of the decision, though, was that supervisors were liable for discriminatory acts within the scope of their authority when that authority provides them the ability to create a hostile work environment "present[ing] a serious barrier" to "full participation in the workforce." *Id.* at 166. Finally, contrary to the suggestion by the majority, *College-Town* did not in imposing vicarious liability rely upon any "restrict[ion]" rooted in "chain of command considerations" on a complainant's ability to notify of discrimination those above the supervisory level. *Ante* at 559.

[11]The majority is also incorrect when it states that failure to impose vicarious liability would not create the anomaly — noted in *College-Town* — "that a notice requirement creates when the perpetrator is also the supervisor to whom notice would be given by an employee." *Ante* at 558-559. If Aldridge had been discriminated against by a less senior O'Connor employee at the work site, a complaint to Daley, its work site supervisor, would have sufficed to put O'Connor on notice such that it would be liable if Daley "fail[ed] to remedy or report" it. *College-Town*, 400 Mass. at 167. It would be anomalous if Daley's own discriminatory conduct did not similarly give rise to liability. *Ibid.*

In fact, failure to impose vicarious liability upon a general contractor like O'Connor that operates a unitary work site would be anomalous for an additional reason because recognizing such liability would impose no additional legal requirements upon the general contractor. Under *College-Town*, O'Connor

It is also clear that the conduct at issue was actionably discriminatory. If harassment or abuse in the workplace on the basis of race is sufficiently severe or pervasive it will create a hostile work environment. O'Connor's supervisor deliberately created a profoundly offensive, racially hostile work environment. He repeatedly referred to African-Americans employed at the workplace for which he was responsible, including Aldridge, with the use of racial epithets, primarily the one that is widely regarded as the most hateful and offensive.

Because of its effects on the workplace and those, including Aldridge, who worked within it, such conduct cannot be characterized, as O'Connor suggests, merely as "four isolated comments." Such racial discrimination is sufficiently severe and independently sufficiently pervasive to alter the conditions of employment and create an abusive working environment. Such racial discrimination, with its attendant public and private humiliation and degradation, cf. *College-Town*, 400 Mass. at 162, has consequences that may endure long after the offensive remarks are made. This conduct by O'Connor's supervisor gave rise to liability under § 4 prior to its failures of investigation and remediation.[12]

The majority expresses concern that recognition of interference liability could render "an employer liable to a broad spectrum of third-party nonemployees," all the way down to "delivery persons . . . and canteen workers who conduct their business on the employer's work site."[13] *Ante* at 559. While I am sensitive to this concern about the potential scope of liability, it is

_____

already could have been vicariously liable for Daley's acts in creating a hostile work environment at its work site. If James Lucas, an African-American employed by O'Connor at the work site, for example, had brought this same action on the basis of Daley's conduct, O'Connor would have been subject to suit regardless whether O'Connor itself had notice or failed to take adequate remedial steps, see *College-Town*, 400 Mass. at 165-166. Cf. *ante* at 558-559. O'Connor, therefore, already must take precisely the same care in the hiring and the oversight of its supervisors that it would have to take were it held vicariously liable for its supervisors' conduct.

[12]It was Daley's conduct, not any subsequent actions or inactions by O'Connor, that created the hostile environment at the work site. I do not read the majority's reference to "the general contractor, upon learning, fail[ing] to take appropriate remedial action" to mean otherwise. Compare *ante* at 561.

[13]While framed as an objection to vicarious liability, this really amounts to a reservation about the interference claim that the majority recognizes today,

568                                   72 Mass. App. Ct. 549 (2008)

Thomas O'Connor Constructors, Inc. *v.* Massachusetts Commission Against Discrimination.

not well founded. As the small number of interference claims decided since their recognition by the Federal courts and by the commission makes clear, recognition of interference liability here will not lead to the "limitless" liability hypothesized by the majority. *Ibid.*

An employer like O'Connor can not be liable to anyone unless its discriminatory acts interfere with a complainant's employment, for example his or her hiring, promotion, or continued employment; his or her compensation; or the terms, conditions, or privileges of his or her employment. See G. L. c. 151B, § 4(1). With respect to a hostile work environment claim like the one at issue here, the employer, whether directly or vicariously liable, would have to engage in harassment or abuse sufficiently severe or pervasive to pose a "barrier[] to full participation in [the individual's] workplace." *College-Town*, 400 Mass. at 162.

There are substantial limits to such liability. On the one hand, it is unlikely that the actions of an employer toward, for example, a delivery person who comes on premises for a few minutes during his or her work day could rise to that level. On the other, the discriminatory creation by a company's supervisor of a hostile environment in which on-premises cafeteria workers employed by a third party are required to work only can occur where the supervisor has the ability to create such an environment — and this is precisely the type of conduct the Legislature in enacting G. L. c. 151B, § 4, intended to root out. Compare *King* v. *Chrysler Corp.*, 812 F. Supp. 151, 153-154 (E.D. Mo. 1993). The reason an interference claim by Aldridge is available against O'Connor here is precisely because Aldridge, unlike most employees of third-party employers, worked for a subcontractor of O'Connor at a work site that was controlled by O'Connor. Only that circumstance gave Daley the ability to render Aldridge's work environment racially hostile.[14]

Although I conclude that O'Connor's liability arose prior to

one of several such reservations contained in the majority's opinion. *Ante* at 556 n.10, 557-559.

[14]The majority's suggestion that it would be easier for a subcontractor's employee to report discrimination to "the corporate hierarchy of the perpetrator's employer" when the perpetrator works for the general contractor, *ante* at 559, takes inadequate account of the nature of the workplace. While that

and independent of its subsequent failures, I agree with the majority that the defendant here did not conduct a "fair or thorough investigation of [the] allegation," *College-Town*, 400 Mass. at 167, and that its remedial actions were insufficient to meet its legal obligations. The findings of the hearing commissioner amply demonstrate the inadequacy of O'Connor's actions.[15]

Finally, because I conclude that O'Connor was liable for the discriminatory actions of its work site supervisor, I agree with the majority that the damages award properly should be upheld in full. An emotional distress damage award must be supported by "substantial evidence and its factual basis must be made clear on the record." *Stonehill College* v. *Massachusetts Commn. Against Discrimination*, 441 Mass. 549, 576 (2004). As the majority describes, *ante* at 561, there was in the record substantial evidence supporting an award of emotional distress damages, and there was "substantial evidence of a causal connection between the complainant's emotional distress and the respondent's unlawful act." *DeRoche* v. *Massachusetts Commn. Against Discrimination*, 447 Mass. 1, 7 (2006).[16] Based on the evidence, the commission was within its discretion in ordering an emotional damages

employee might know the relevant corporate actors of his or her own employer, there is no reason to think he or she will know anything about the corporate structure of the general contractor.

[15]After O'Connor's project manager told Aldridge that he would "get to the bottom of it," no one from O'Connor ever spoke with Aldridge again regarding his complaint, either to take his statement, to tell him what steps the investigation would entail, to inform him of its progress, or to explain its conclusion. See *College-Town*, 400 Mass. at 167-168. The hearing officer found that, instead of fulfilling its legal obligation, O'Connor "began taking a defensive posture in anticipation of litigation." When asked, Lucas apparently reported to O'Connor that he had only heard of the racial slurs second-hand through Rustic Fire Protection's Ron Russell and Aldridge. O'Connor prepared a statement for Lucas to sign that read, "I have never been harassed nor suffered discrimination from any O'Connor Constructor Supervisory or other personnel during my employment with O'Connor Constructors up to and including this date." Lucas refused to sign.

An internal document makes clear that O'Connor terminated the investigation after a deliberate decision not to complete it, choosing instead to wait until a claim, if any, was filed against it. Indeed, the investigation did not even reach a conclusion about what had happened. Instead, Daley simply was returned to the work site. Cf. *id.* at 168.

[16]There was evidence supporting the award with respect to the first three of

award of $50,000. I agree, too, that the training order as amended by the full commission — the only other aspect of the remedial order raised before us by O'Connor — should be upheld. It is limited to six hours of antidiscrimination training for managers and supervisors. This aspect of the remedial order was not an abuse of the commission's discretion. See *School Comm. of Norton* v. *Massachusetts Commn. Against Discrimination*, 63 Mass. App. Ct. 839, 849 (2005).

---

four nonexclusive factors that *Stonehill College* instructs us to consider. See *Stonehill College* v. *Massachusetts Commn. Against Discrimination, supra* at 576 (factors to be considered "include [1] the nature and character of the alleged harm; [2] the severity of the harm; [3] the length of time the complainant has suffered and reasonably expects to suffer; and [4] whether the complainant has attempted to mitigate the harm [e.g., by counselling or by taking medication]"). There was no evidence that Aldridge attended counselling, or took medication in an attempt to mitigate his harm, but that alone does not render the award unreasonable. See *ibid.* (emotional distress damages awards should not be determined by formula, but "should be fair and reasonable, and proportionate to the distress suffered"). See also *Buckley Nursing Home, Inc.* v. *Massachusetts Commn. Against Discrimination*, 20 Mass. App. Ct. 172, 185 (1985) ("The burden of proof on mitigation is on the employer").