Kirpalani, Maynard M., J.
INTRODUCTION
The plaintiff, RoShaun Bennefield (“Bennefield”), alleges that the defendant, his employer, Kohl’s Department Stores, Inc. (“Kohl’s”), discriminated against him on the basis of his race (black) in violation of G.L.c. 15IB. More particularly, Bennefield contends Kohl’s created a hostile work environment by allowing loss prevention staff to harass and intimidate him and by failing to remedy racial graffiti left for him in a public restroom. The matter is currently before the court on Kohl’s Motion to Dismiss. For the reasons explained herein, Kohl’s Motion to Dismiss will be ALLOWED.
BACKGROUND
For purposes of Kohl’s Motion to Dismiss, the court accepts as true the factual allegations asserted in *636 Bennefield’s Complaint. See Berkowitz v. President & Fellows of Harvard Coll., 58 Mass.App.Ct. 262, 270 (2003).
I. Facts
Bennefield is a twenty-four-year-old black male with a tenth-grade education. Kohl’s is a department store chain that operates various stores in, among other states, Massachusetts. In January 2009, Bennefield began working nights at a Kohl’s store located in Danvers, Massachusetts. He was employed in the shipping department and worked unloading merchandise trucks. Throughout his employment, Bennefield was the only black person Kohl’s employed at this location.
Some four months after he started working at Kohl’s, on May 13, 2009, Bennefield was called into the manager’s office by two loss prevention officers (the “LP Officers”).[1] When he entered the office, the LP Officers presented him with three VHS tapes labeled with his name. The LP Offices then began questioning Bennefield about his relationship with a co-worker named Kevin.[2] He told the LP Officers that, through work, he was well-enough acquainted with Kevin to say “hello,” but that they were not “friends.” At this point, the LP Officers told Bennefield he “appeared nervous” and that his anxiety increased when they mentioned Kevin. Bennefield informed the LP officers that he was nervous because he did not understand why he was being “interrogated.”
As the interview continued, the LP Officers told Bennefield that the store in Danvers had a theft problem and that it had, in fact, lost approximately $400,000.00 in stolen merchandise over the previous few years. They also told him that they believed the thefts were occurring on the night shift when he was usually at work. The LP Officers then proceeded to ask Bennefield about his bathroom habits, pointing out an occasion when he was in the bathroom longer than usual. Immediately thereafter, the LP Officers told Bennefield that there were cameras “everywhere.”
After insinuating that the videotapes contained evidence of Bennefield stealing, the LP Officers brought up certain old criminal charges for which Bennefield had been acquitted. The LP Officers then asked Bennefield if he was stealing due to the difficult economy. They stated he was a “player” because “it[ ] [was] hard times” and nobody could be expected to survive on his weekly salary of $160.00.[3] At the end of the interview, the LP Officers reiterated that there were cameras “everywhere” and also stated that they would be “watching” Bennefield. The LP Officers never actually presented Bennefield with a tape showing him stealing or directly accused him of committing theft.
About six weeks after this interview, on June 28, 2009, Bennefield went into one of the public restrooms at work and found the phrase “I hate Niggers” carved into the wall of one of the stalls. Shortly thereafter, he walked into the bathroom and found a swastika carved into the wall. Then, a few days later, next to the word “Niggers” Bennefield found the word “snitches” carved into the wall. Kohl’s permitted the swastika and other racial slurs to remain on the stall wall for more than a month.
In addition to the graffiti, Kohl’s management sent co-workers to try to lure Bennefield into stealing. More specifically, Bennefield was approached by several employees and asked to help them steal merchandise or, alternatively, questioned about whether it was difficult to steal from the store.[4] Finally, whenever Bennefield uses the restroom, he is followed by another employee who goes into the stall after him to check and see if he has hidden any merchandise to retrieve later.
II. Procedural Histoiy
On October 22, 2009, Bennefield filed a complaint against Kohl’s with the Massachusetts Commission Against Discrimination (the “MCAD”), alleging discrimination based upon his race and hostile work environment. Subsequently, in December 2010, Bennefield requested permission to withdraw his complaint and file it with the Superior Court. On Januaiy 21, 2011, the MCAD granted Bennefield’s request. Thereafter, on April 7, 2011, Bennefield filed the current Complaint, asserting a single count for violation of G.L.c. 151B premised on race discrimination and hostile work environment. In response, on August 22, 2011, Kohl’s filed the Motion to Dismiss. A hearing on the Motion to Dismiss was held on November 16,2011. At this hearing, the court invited the parties to submit supplemental filings addressing the issue of whether graffiti alone can sufficiently support a claim for racial discrimination. Although the court received Kohl’s supplemental filing on December 19, 2011, to date, it has received no such filing from Bennefield.
DISCUSSION
Kohl’s argues Bennefield’s claim for discrimination, which is based on hostile work environment, must be dismissed because he cannot establish the elements necessary to support such a claim. In answer, Bennefield contends he has sufficient facts to support a prima facie case for race discrimination from which a jury could reasonably conclude he was subjected to a hostile work environment. After careful review, the court concludes that Kohl’s is correct.
I. Standard of Review
In evaluating the sufficiency of a complaint under Mass.R.Civ.P. 12(b)(6), the court accepts as true all factual allegations in the complaint and all reasonable inferences that may be drawn in the plaintiffs favor. Berish v. Bornstein, 437 Mass. 252, 267 (2002). The complaint must set forth the basis of the plaintiffs entitlement to relief with “more than labels and conclusions.” Iannacchino v. Ford Motor Co., 451 Mass. 623, 635-36 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). While the factual allegations *637 need not be detailed, “a formulaic recitation of the elements of a cause of action will not do.” Bell Atl. Corp., 550 U.S. at 555. Rather, the factual allegations “must be enough to raise a right to relief above the speculative level . . .” Id., quoting Bell Atl. Corp., 550 U.S. at 555. This requires that, at the pleading stage, the complaint set forth “factual ‘allegations plausibly suggesting (not merely consistent with)’ an entitlement to relief. . .” Id., quoting Bell Atl. Corp., 550 U.S. at 557.
II. Hostile Work Environment— Race Discrimination
The concept of a “hostile work environment” claim was developed in the context of sexual harassment case law, and is dependent upon a finding that the environment is “pervaded by harassment or abuse,” which “result(s) [in] intimidation, humiliation, and stigmatization,” such that it poses “a formidable barrier” to an individual’s full participation in the workplace. Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 532 (2001) (internal quotations and citations omitted). This concept has since been expanded to other lypes of discrimination and an employee may make out a race discrimination claim premised on hostile work environment, if he alleges “offensive race-based conduct that is severe or pervasive enough to create an objectively hostile or abusive work environment.” Landrau-Romero v. Banco Popular de Puerto Rico, 212 F.3d 607, 613 (IstCir. 2000), citing Lattimore v. Polaroid Corp., 99 F.3d 456, 463 (1st Cir. 1996). To prevail on such a claim, a plaintiff must show not only that he suffered harassment that made his employment significantly less desirable to him personally, but also that the harassment “was of such a nature that it would make the plaintiffs [employment] significantly less desirable to a reasonable person in the plaintiffs position.” Gnerre v. Massachusetts Comm’n Against Discrimination, 402 Mass. 502, 507-08 (1988). Finally, in determining what circumstances will give rise to a hostile work environment claim under G.L.c. 15 IB, the court may look to Federal cases addressing hostile work environment claims under Title VII which is the analogous Federal statute. See College-Town, Division of Interco, Inc. v. Massachusetts Comm’n Against Discrimination, 400 Mass. 156, 163 (1987), citing Massachusetts Elec. Co. v. Massachusetts Comm’n Against Discrimination, 375 Mass. 160, 167 (1978).
In this case, Bennefield presents four distinct and identifiable events/allegations to support his hostile work environment claim: (1) the interview with the LP Officers wherein they questioned him regarding his relationship with Kevin and asked what he knew about thefts occurring at the store; (2) the racial graffiti on the wall in the restroom and the fact that Kohl’s failed to immediately remove it; (3) the fact that management sent co-workers to ask him about stealing in an effort to entrap him; and (4) the fact that another employee always follows him to the bathroom and checks the stall when he is finished to ensure that he has not stored any merchandise there to retrieve at a later time. The issue for the court is whether these events/allegations, even if true, are severe and pervasive enough to interfere with a reasonable person’s work performance. See Muzzy v. Cahillane Motors, Inc., 434 Mass. 409, 411 (2001). After careful consideration, the court concludes they are not.
First, with the exception of the graffiti on the wall in the public restroom, the events/allegations Bennefield uses to support his race discrimination claim lack any clear connection to his race. Bennefield alleges no facts to support his contention that the LP Officers chose to interview him because he was black; that his managers actually sent co-workers to ask him about stealing or, if such did occur, that it was because of his race; or that he was followed to the restroom because he was black.[5] Indeed, even accepting these events/allegations as true, it appears that, rather than being motivated by race, they were motivated by a desire to stop the theft problem Kohl’s had been dealing with during the previous few years. Even Bennefield admits that the LP Officers never actually accused him of theft. Instead, they were interested in his association with Kevin, i.e., their primary suspect.
Second, even assuming that the conduct complained of was racially motivated and specifically directed at Bennefield, which is not clear, the conduct is not severe or pervasive enough to interfere with a reasonable person’s ability to perform the functions of his job. While the Massachusetts appellate courts have allowed claims of racial discrimination premised on hostile work environment, the conduct complained of in those cases is much more egregious than the conduct present in the current case. See e.g., Clifton v. Massachusetts Bay Transp. Auth., 445 Mass. 611, 613-17 (2005); O’Connor Constructors, Inv. v. Massachusetts Comm’n Against Discrimination, 72 Mass.App.Ct. 549, 560-61 (2008); Windross v. Village Automotive Group, 71 Mass.App.Ct. 861, 869-70 (2008).
In Clifton, the plaintiff was a black male working for the Massachusetts Bay Transportation Authority. 445 Mass, at 612. And, throughout his nine years of employment, he was subjected to “a pattern of egregious racial harassment” by both supervisors and co-workers. Id. at 613. Co-workers “shot bottle rockets at him, turned the lights off when he used the bathroom, sprayed water at him through fire hoses, dropped firecrackers near him, set water booby-traps that would fall on him when he opened his office door, and painted ‘fag bait’ and ‘Sandford and Son’ on his locker.” Id. Then, when the plaintiff complained about this conduct, his supervisor called him a “rat” and joined in the harassment, “calling the plaintiff ‘Roxbuiy Mayor,’ ‘fucking banana,’ and ‘Sanford’ and referring to the plaintiff and another black employee *638 as ‘ding and dong.’ ” Id. at 613-14. In addition to this harassment, rules were enforced against the plaintiff that were not applied to other employees and rules regarding job advancement were constantly changed to benefit white employees at the plaintiffs expense. Id. at 614. Further, there was an incident impugning the plaintiffs wife’s character. Id. A co-worker “placed a photograph of an African-American woman (who resembled the plaintiffs wife) on a flyer, with words indicating that the woman was available for sexual services, and listing the plaintiffs pager number.” Id. These circumstances were considered sufficient to establish a claim for race discrimination premised on hostile work environment.
The plaintiff in O’Connor was a black male construction worker subjected to racially offensive remarks made by a supervisor about himself and another black co-worker. 72 Mass.App.Ct. at 550-51. First, the supervisor referred to the co-worker as a “fucking dumb nigger” in the plaintiffs presence. Id. at 552. Then, when informed that “nigger” was a racial slur, the supervisor laughed. Id. On a second occasion, the supervisor, again in the plaintiffs presence, referred to the co-worker in the same manner. Id. Thereafter, during a conversation at lunch about sports, the supervisor referred to the plaintiff, in front of others, as a “black bastard.” Id. Finally, the supervisor complained to one of the plaintiffs co-workers that the plaintiff had “reaped the benefits of a prevailing wage job because he . . . [was] a ‘fucking nigger.’ ” Id. These repeated racial slurs specifically directed at the plaintiff and his black co-worker by a supervisor were deemed sufficient to set forth a race discrimination claim based on hostile work environment.
In Windross, the plaintiff was a black male of Jamaican descent working for a car dealership. 71 Mass.App.Ct. at 862. And, again, as with Clifton and O’Connor, the plaintiff in this case was exposed to an extensive pattern of harassment. Id. at 869-70. Before the plaintiff even started work at the dealership, the general manager told him that working there was “not like Toyota where you have the United Nations,” and that his new co-workers were a “bunch of elder whites.” Id. at 869. Then, while at work, he was prohibited from wearing the company’s black Saab shirt “because he was black and management ‘didn’t want [him] looking that way in front of customers[.]’ ” Id. Co-workers told him it was his fault customers were not coming into the showroom, and he was reprimanded by co-workers regarding his haircut. Id. At a staff meeting, “a sales manager asserted while looking straight at... [the plaintiff] (who regularly wore a gold chain necklace) ‘only sleazy salesperson^] wear gold chains[.]’ ” Id. In addition, the plaintiffs co-workers repeatedly taunted him regarding his pronunciation of certain words. Id. And, one co-worker “told him that something was wrong with his hands since they were light on one side and dark on the other[.]” Id. at 869-70. The plaintiff was also arbitrarily blamed for errors that were made by others. Id. at conduct was considered sufficient to support a claim for race discrimination predicated on hostile work environment.
In comparing the current case to the circumstances presented in the cases described above, it seems clear that the conduct Bennefield complains of falls far short of what is typically considered necessary for a viable hostile work environment claim. While it may be true that Bennefield subjectively felt like the events identified significantly impacted his job performance, the court concludes that no reasonable jury could conclude that the harassment complained of was of such a nature that it would make Bennefield’s employment significantly less desirable to a reasonable person in his position. Gnerre, 402 Mass. 507-08. One isolated incident of race-based graffiti, while unquestionably offensive, is insufficient to demonstrate a hostile work environment. For this reason, Kohl’s Motion to Dismiss will be ALLOWED.[6]
ORDER
For the reasons explained above, it is hereby ORDERED that Kohl’s Motion to Dismiss be ALLOWED.

The LP Officers are not identified by name.

No surname is provided for “Kevin.”

Bennefield only worked at Kohl’s two nights per week.

These employees are not identified by name or title.

Bennefield fails to provide any nexus between the conduct complained of and his race. He presents no factual allegations to support the contention that Kohl’s or its employees discriminated against him on the basis of his race. The only conduct that had any connection to his race was the graffiti, which was found in a public restroom, which was used by both employees and Kohl’s customers.

Notably, while the Massachusetts appellate courts have not issued a decision on point, other jurisdictions addressing similar claims have, as Kohl’s points out, concluded that graffiti alone is insufficient to establish harassment severe and pervasive enough to support a hostile work environment claim. See, e.g., Buchanan v. Tyson Foods, Inc., 2011 WL 561040 *3-4 (W.D.Ark. Feb. 8, 2011) (holding that graffiti depicting a hangman’s noose and Ku Klux Klan symbols as well as being referred to as a "monkey” or “boy” over the span of more than thirty years of employment did not suggest the existence of a workplace permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of employment); Woodward v. Tower Auto Prods. Co., 2004 WL 2203394 *2 (N.D. Ill. Sept. 29,2004) (stating graffiti reading “Niggers, who needs them, go back to Africa,” depicting swastikas, and portraying a person being hung next to the word “nigger” was offensive but was, alone, not severe or pervasive enough to be actionable); Carson v. Giant Food, Inc., 187 F.Sup.2d 462, 477-78 (D.Md. 2002) (concluding racial graffiti not specifically directed at plaintiffs but written on trailers and bathroom walls, amidst other tasteless non-racist graffiti of all sorts, although offensive to “anyone with good sense and good values” was not sufficient to establish severe and pervasive harassment).