# United States Court of Appeals
## For the First Circuit

No. 08-2479

GORDON BARTON,

Plaintiff, Appellant,

v.

EDWARD J. CLANCY, JR., individually and in his capacity as Mayor
of the City of Lynn, Massachusetts,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lipez, Stahl, and Howard,
Circuit Judges.

Harold L. Lichten, with whom Leah M. Barrault and Lichten &
Liss-Riordan, P.C. were on brief, for appellant.
John R. Hitt, with whom Cosgrove, Eisenberg & Kiley, P.C., and
James Lamanna, Assistant City Solicitor, were on brief, for
appellee.

January 14, 2011

**LIPEZ**, **Circuit Judge**.  Plaintiff Gordon Barton appeals from the district court's grant of summary judgment to defendant Edward J. Clancy, Jr., mayor of the City of Lynn, Massachusetts (City or Lynn).  Barton brought claims against Clancy for disability harassment, Mass. Gen. Laws ch. 151B, § 4, and retaliation based on the exercise of his First Amendment rights, 42 U.S.C. § 1983.[1]  Barton's claims stemmed from an ongoing conflict between Clancy and Barton, an African-American who served as a firefighter for the City for nearly thirty years, until his involuntary retirement in 2004 due to a work-related back injury.  During that time and in the years following his retirement, Barton was an outspoken representative of the firefighter's union and a vocal and frequent critic of City policies, and he participated in several lawsuits against the City raising claims of race discrimination and union contract violations.  In addition to serving as a firefighter, Barton served by appointment as a volunteer on the City's Parks Commission beginning in 1996.  After his disability retirement from the fire department, Barton was hired in the fall of 2006 as the boys' basketball coach for one of the City's public high schools.

In April 2006, Clancy declined to reappoint Barton to the Parks Commission.  In the fall of 2006 and the spring of 2007,

---

[1] Barton brought several additional claims under Massachusetts state law, the dismissal of which he does not appeal here.

-2-

after Barton was hired for the basketball coaching job, Clancy publicly criticized Barton's ability to perform the job on the ground that he had retired because of disability, repeatedly called upon school officials to rescind his appointment, and initiated investigations into Barton's payment of taxes and his disability pension.

After careful consideration, we affirm the grant of summary judgment as to the state law disability harassment claim, which arises from Clancy's persistent public criticism of Barton following his appointment as basketball coach. We conclude that the mayor was not Barton's employer for purposes of the coaching job. Although a few Massachusetts decisions have imposed liability for workplace harassment on defendants who were not the plaintiff's employer, none have imposed liability on a non-employer where, as here, the alleged harasser was never physically present on the plaintiff's work site and none of the alleged harassing acts occurred at the plaintiff's workplace.

We likewise affirm the grant of summary judgment as to the First Amendment claim. Leaving for another day the question of whether Barton has demonstrated a First Amendment violation based on the non-reappointment to a volunteer position, we conclude that Clancy's refusal to reappoint Barton to the Parks Commission in retaliation for the exercise of his First Amendment rights was not a violation of clearly established law. We also conclude that

Clancy is entitled to qualified immunity on Barton's First Amendment claim based on retaliatory harassment because we cannot say that a reasonable official in Clancy's shoes would have understood that his conduct violated Barton's constitutional rights.

## I.

We recount the facts with the summary judgment standard in mind, viewing the record in the light most favorable to the nonmoving party, Barton. Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 444 (1st Cir. 2009).

### A. Barton's First Amendment Activities

Barton has spoken out against Mayor Clancy and the City on a number of occasions. He served as a firefighter for the City from 1976 until 2004. As president of the Lynn firefighter's union from 2000 until 2004, he was the "public face" of the union. In 2002, Clancy announced that the City would be laying off over thirty firefighters. In response, Barton had a series of meetings with Clancy and made statements to the local press expressing the union's position that the lay-offs would negatively affect the safety of Lynn citizens. Around this same time, Lynn firefighters picketed a fundraiser held by Clancy. Barton was present during the picketing and had a heated discussion with Clancy, in which Clancy stated to Barton, "[i]t shouldn't have come to this."

Barton also participated in several lawsuits against the City. In 2004, the firefighter's union filed a lawsuit against the City and Clancy, seeking funding for certain staffing clauses in the union contract. The union obtained an injunction against Clancy, ordering him to submit a funding request for the staffing clauses at issue. Also in 2004, Barton was involved in a complaint filed with the Massachusetts Commission Against Discrimination (MCAD) against the Lynn Water and Sewer Commission, challenging the Water and Sewer Commission's hiring practices as racially discriminatory. In 2005, Barton was involved in a class action lawsuit against the City, alleging that the civil service examination used to qualify and rank applicants for firefighter positions had a disparate impact on African-American and Hispanic candidates.[2] Finally, in 2006, Barton agreed, based on his union sympathies, to be a plaintiff in a taxpayer lawsuit against the City and Clancy, which sought to block the transfer of custodial employees from the school department to the inspectional services department. Clancy was aware of Barton's involvement in these lawsuits and complaints against the City.

---

[2] Barton was not named as a plaintiff in either the 2004 complaint against the Water and Sewer Commission or the 2005 suit against the City. However, Barton testified that he supported and was involved in each of these suits, and Clancy does not dispute Barton's involvement.

## B. Barton's Retirement from the Fire Department

In 2004, after Barton suffered a work-related back injury, the Chief of the Fire Department filed an application for involuntary retirement with the Lynn Retirement Board asking that Barton be retired because he was "unable to perform his job now and in the future." The Lynn Retirement Board approved the application, concluding, based on findings from a medical panel that examined Barton, that he was "physically incapable of performing the essential duties of his job and that said incapacity is likely to be permanent." The Lynn Retirement Board granted Barton an accidental disability retirement pension. Although Barton's back injury renders him physically unable to perform his job as a firefighter, it does not prevent him from doing other kinds of jobs, and he is physically able to work as a basketball coach.

## C. Barton's Non-Reappointment to the Lynn Parks Commission

Barton was appointed to serve on the Lynn Parks Commission in 1996, and was reappointed in 2000, prior to Clancy's election as Mayor. The Lynn Parks Commission has general supervisory powers over the City's parks and playgrounds. There is no monetary compensation for service on the Parks Commission. Barton explained that the primary benefit he received from serving on the Parks Commission was the opportunity to help people.

Barton served on the Parks Commission under his 2000 appointment until April 10, 2006, when he received a one-sentence letter from Clancy thanking him for his service on the Commmission. Clancy testified in deposition that he decided not to reappoint Barton in 2006 because Barton had not requested reappointment. Clancy had not asked Barton whether he was interested in reappointment, and could not recall whether the individual who replaced Barton had requested appointment.

**D. Barton's Appointment as Basketball Coach**

In the fall of 2006, the boys' basketball coach at Lynn English High School resigned, leaving an immediate vacancy. On November 28, 2006, Clancy met with Superintendent of Lynn Public Schools Nicholas Kostan, Lynn English Principal Andy Fila, and members of the School Committee to discuss hiring a replacement coach. Clancy left before the close of the meeting, and was informed later that afternoon that Superintendent Kostan, upon Principal Fila's recommendation, had hired Barton as interim coach for the 2006-2007 basketball season.

On the following day, November 29, Clancy hand-delivered a letter to Principal Fila strongly criticizing the decision to hire Barton and urging that Barton's appointment be rescinded. The November 29 letter stated, inter alia:

> To my utter astonishment, Superintendent Nick Kostan called me later that afternoon to inform me you had chosen, and he had approved the choice of Gordon "Buzzy" Barton to be the

interim basketball coach. It is my understanding that Mr. Barton is receiving an accidental disability retirement pension from the City of Lynn because of a chronically-disabling injury. To me, it is oxymoronic to choose a person for this position who is receiving a pension, based on an accidental disability due to a possibly disabling physical injury. It is an insult to the intelligence of the taxpayers of this city. . . .

Mr. Barton may possess many redeeming qualities. However, a person receiving a disability pension does not fit the mold for a vigorous individual that is implicit in the qualifications of being a basketball coach. . . . I believe you should immediately rescind this appointment. Personally, since this is an interim appointment, a stable, established person with coaching experience at the high school level should be chosen.

Despite Clancy's protests, Barton remained employed as the interim basketball coach. At the close of a successful 2006-2007 basketball season, Superintendent Kostan officially hired Barton as full-time coach for the boys' basketball team. On May 9, 2007, after learning that Barton had been appointed as full-time coach, Clancy sent a second letter objecting to Barton's appointment, this time to Superintendent Kostan. Clancy's May 9 letter expressed "disappointment" with the decision to hire Barton and stated in part:

Why my objection?
Merriam-Webster's Collegiate Dictionary Eleventh Edition defines disability as follows:
    (1b) inability to pursue an occupation because of a physical impairment;

(2) lack of legal qualification to do something.

Mr. Gordon Barton is retired from the Lynn Fire Department on an accidental disability pension. . . .

I believe the taxpayers and citizens of the City of Lynn are entitled to an explanation of how its interests are being protected by the hiring of an individual who is receiving an accidental disability pension based on a physical inability to work. The efficacy of the public employee retirement system is called into question. Next to the burgeoning cost of health insurance, the skyrocketing increases in pension costs put a strain on municipal budgets and the City of Lynn's tax rate. I reiterate the contention I expressed in my letter of November 29, 2006 to Principal Fila. I take strong exception to your approval of Mr. Fila's appointment of Mr. Barton absent sufficient evidence to protect the financial interests of the City of Lynn.

Again, in spite of Clancy's strong criticisms, Superintendent Kostan did not discharge Barton.

In addition to sending these letters directly to Principal Fila and Superintendent Kostan, Clancy provided the letters to the local press. Clancy's letters sparked multiple news articles, several of which included excerpts of the letters. Many Lynn residents sent letters to local newspapers expressing their views on the topic, and many residents mentioned Clancy's letters to Barton.

Shortly after writing the second letter, Clancy made similarly critical statements about Barton's appointment in an

interview with a local newspaper, <u>The Daily Item</u>.  Clancy was

quoted as stating:

> "My opinion of Barton's suitability aside, the principle of having a person who is receiving disability -- income tax free -- state pension coaching is an anomaly and the city's financial interests have to be protected," [Clancy] said. "What should happen is Barton or Fila or whoever should get an indemnity policy absolving the city of any liability."
> . . .
>
> "I don't care if he is just walking on the court, he is receiving disability pension from the city of Lynn based on physical incapacity," Clancy said.  "(The state declared him) physically unable to work so I think that disqualifies him from being coach. In a basketball game there is movement, there is energy, there is synergy and the coach shows, at least in some fashion, how you play defense or how a point guard plays offense. Inherently, it implies or assumes some degree of physical dexterity and Barton retired from the city for the inability to do just that."
> . . .
>
> "If Barton gets a physical that says he's able to work and Fila and Nick say he's the basketball coach, I will participate in a jump-ball ceremony for charity before the first game," he said.  "Absent the physical disability disappearance, we need, at the very least, a liability waiver."

In addition to his public attacks on Barton's appointment

as basketball coach and his requests to Barton's hiring authorities

that the appointment be rescinded, Clancy initiated investigations

into Barton's taxes and disability pension.  Sometime after writing

the November 29, 2006 letter, Clancy made a request to the City's

deputy tax collector for any public documents related to Barton's

payment of taxes.  Clancy requested these records based on his recollection that Barton had been late or delinquent in paying certain taxes.  He intended to use the tax documents to "see if the pattern that I had seen earlier had persisted and whether my recollection was correct or not."  Clancy could not recall any individuals about whom he had made a similar request for tax information.  In addition, Clancy requested public documents about Barton's disability pension from the Lynn Retirement Board.  Barton was made aware of Clancy's requests for his tax and pension records.  In addition, in late May 2007, shortly after Barton filed this lawsuit, attorneys for Barton and Clancy sparred over whether state law prohibited Barton from working as a basketball coach while receiving an accidental disability pension.

Clancy's conduct, and the resulting public controversy surrounding Barton's employment, made Barton feel that he was "not wanted" for the job and at times distracted him from his coaching. Clancy's actions made Barton fearful about losing his disability pension and his job as basketball coach, caused him immense stress, and made him feel sick.  He also had trouble sleeping.

## E. Proceedings in the District Court

In May 2007, Barton filed this suit against Clancy, individually and in his capacity as Mayor of the City of Lynn.  As relevant to this appeal, Barton asserted a violation of his rights under Massachusetts state law, Mass. Gen. Laws ch. 151B (ch. 151B),

§ 4, alleging that Clancy's conduct related to Barton's appointment as basketball coach constituted unlawful disability harassment. Barton further asserted a 42 U.S.C. § 1983 claim[3] for violation of his rights under the First Amendment, alleging that Clancy's failure to reappoint him to the Parks Commission and Clancy's conduct related to the basketball coaching job constituted unlawful retaliation based on the exercise of Barton's First Amendment rights.

The district court granted Clancy's motion for summary judgment as to both claims.[4] As to the disability harassment claim, the district court concluded that Clancy was not Barton's employer and, although MCAD decisions have imposed liability for workplace harassment absent a direct employment relationship, those decisions have not imposed liability for acts such as Clancy's that occurred outside the workplace setting. The court further

---

[3] Section 1983 imposes civil liability upon any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Mayor Clancy does not dispute that he was acting under color of state law when he engaged in the conduct at issue here.

[4] The district court also granted Clancy summary judgment as to Barton's remaining claims for tortious interference with advantageous business relations, handicap discrimination in violation of ch. 151B, § 4(16), unlawful retaliation in violation of ch. 151B, § 4, and violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11(1). On appeal, Barton does not challenge the district court's ruling as to these claims, and we do not address them.

concluded that Clancy's actions were not sufficiently severe or pervasive to create a hostile work environment.

As to the First Amendment claim, the court found that Barton had asserted a "plausible First Amendment retaliation claim" based on both Clancy's refusal to reappoint Barton to the Lynn Parks Commission and Clancy's conduct related to Barton's appointment as basketball coach. The court concluded that Barton had shown that he spoke out on matters of public concern, that Clancy's actions would tend to chill individuals in their exercise of constitutional rights, and that there was a genuine issue of material fact as to whether Clancy's actions were motivated by Barton's history of speaking out. However, the court concluded that Barton was entitled to qualified immunity because none of the allegedly retaliatory acts violated clearly established law.

On appeal, Barton contends that the court erred in granting summary judgment as to his disability harassment and First Amendment claims. Summary judgment is properly granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] We review the district court's grant of

---

[5] Federal Rule of Civil Procedure 56 was amended effective December 1, 2010. Although the prior version was applicable to Clancy's motion, and the district court properly applied that version, the standard has not changed and we thus cite the new rule. See Fed. R. Civ. P. 56 advisory committee notes ("Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word – genuine 'issue' becomes genuine 'dispute.'").

-13-

summary judgment de novo, drawing all reasonable inferences in favor of the nonmoving party. Thermo King, 585 F.3d at 446.

**II.**

Barton contends that the district court erroneously granted summary judgment as to his disability harassment claim under ch. 151B. Clancy responds that the district court properly granted summary judgment for three independent reasons: (1) Barton is not a "handicapped person" for purposes of ch. 151B; (2) Clancy was not Barton's "employer," and ch. 151B does not permit liability to attach to a nonemployer; and (3) Clancy's alleged harassment toward Barton did not create a hostile work environment because it was not workplace related and not sufficiently severe or pervasive.

A federal court sitting in diversity or, as here, exercising supplemental jurisdiction over a state law claim must apply state substantive law. Hoyos v. Telecorp Commc'ns, Inc., 488 F.3d 1, 5 (1st Cir. 2007). In doing so, we "look to the pronouncements of a state's highest court in order to discern the contours of that state's law." González Figueroa v. J.C. Penney P.R., Inc., 568 F.3d 313, 318 (1st Cir. 2009). If the highest court has not spoken directly on the question at issue, we predict "how that court likely would decide the issue," looking to the relevant statutory language, analogous decisions of the state supreme court, decisions of the lower state courts, and other reliable sources of authority. Id. at 318-19.

-14-

## A. Whether Barton Is "Handicapped" Under Chapter 151B

Chapter 151B defines "handicap" to include "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment." Ch. 151B, § 1(17); see also id. § 1(20) (defining the term "major life activities" to include "working"). As the Massachusetts Supreme Judicial Court (SJC) has explained, "[l]oosely speaking, the first prong protects only those persons with actual physical or mental limitations, while the third prong protects those persons who, whether actually impaired or not, may be the victims of stereotypic assumptions, myths, and fears regarding such limitations." Dahill v. Police Dep't of Boston, 748 N.E.2d 956, 962-63 (Mass. 2001). An employee's impairment, whether actual or perceived, substantially limits the employee in the major life activity of working only if the impairment "precludes him from performing a class of jobs." City of New Bedford v. Mass. Comm'n Against Discrimination, 799 N.E.2d 578, 590 (Mass. 2003).

A reasonable jury could conclude that Barton satisfies ch. 151B's definition of handicap because Clancy regarded him as having a physical impairment that substantially limited his ability to perform a range of jobs. Clancy's repeated criticisms of Barton serving as a basketball coach reflect his assumption that, because Barton had a back injury that left him physically unable to work as

a firefighter and eligible for a disability pension, Barton was also physically unable to perform a range of jobs including that of a high school basketball coach. The "regarded as" prong is aimed at precisely this kind of "stereotypic assumption[]." See Dahill, 748 N.E.2d at 963.[6]

## B. Employment Relationship

Clancy next contends that Barton's handicap harassment claim fails because Clancy was not Barton's employer for purposes of ch. 151B. Barton responds that (1) Clancy had sufficient control over the circumstances of Barton's employment to qualify as his employer, and (2) even absent an employment relationship, Clancy may be held liable for handicap harassment under ch. 151B, § 4(4A).

1. Whether Clancy Was Barton's Employer

Chapter 151B's definition of "employer" provides little guidance, stating that

> the term 'employer' does not include a club exclusively social, or a fraternal association or corporation, if such club, association or corporation is not organized for private profit, nor does it include any employer with fewer than six persons in his employ, but shall include the commonwealth and all political subdivisions, boards, departments and commissions thereof.

---

[6] In light of this conclusion, we need not address Barton's alternative argument that he qualifies as a handicapped person by virtue of his work-related back injury under Mass. Gen. Laws ch. 152, § 75B, a section of the Massachusetts workers' compensation law.

Id. § 1(5).  The parties do not cite, and our research has not revealed, any Massachusetts decisions interpreting the term "employer" under ch. 151B in a context similar to this case.  However, in interpreting ch. 151B, Massachusetts courts follow federal case law construing analogous provisions of federal antidiscrimination law.  See Wheatley v. Am. Tel. & Tel. Co., 636 N.E.2d 265, 268 (Mass. 1994).  Therefore, we look to federal decisions interpreting the term "employer" under federal antidiscrimination statutes.

In Lopez v. Massachusetts, 588 F.3d 69 (1st Cir. 2009), we recently interpreted the term "employer" under Title VII of the Civil Rights Act of 1964.  We noted that Supreme Court precedent has "established that when a statute contains the term 'employee' but does not define it, a court must presume that Congress has incorporated traditional agency law principles for identifying 'master-servant relationships.'"  Id. at 83.  Under the common law test, "'the relevant factors defining the master-servant relationship focus on the master's control over the servant.'"  Id. at 84 (quoting Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440, 448 (2003)).

As we explained in Lopez, we look to the guidelines in the Equal Employment Opportunity Commission (EEOC) Compliance Manual to address the question of whether an employment relationship exists.  Id. at 85.  The guidelines list a series of

"non-exhaustive factors" that are indicative of an employment relationship:

> "[t]he employer has the right to control when, where, and how the worker performs the job;" "[t]he work does not require a high level of skill or expertise;" "[t]he work is performed on the employer's premises;" "[t]here is a continuing relationship between the worker and the employer;" "[t]he employer has the right to assign additional projects to the worker;" "[t]he employer sets the hours of work and the duration of the job;" "[t]he worker is paid by the hour, week, or month rather than the agreed cost of performing a particular job;" "[t]he worker does not hire and pay assistants;" "[t]he work performed by the worker is part of the regular business of the employer;" "[t]he employer is in business;" "[t]he worker is not engaged in his/her own distinct occupation or business;" "[t]he employer provides the worker with benefits such as insurance, leave, or workers' compensation;" "[t]he worker is considered an employee of the employer for tax purposes;" "[t]he employer can discharge the worker;" and "[t]he worker and the employer believe that they are creating an employer-employee relationship."

Id. (quoting 2 Equal Emp't Opportunity Comm'n, EEOC Compliance Manual, § 2-III, at 5716-17 (2008)) (alterations in original).

Applying these factors in the instant case, we conclude that Clancy was not Barton's employer. One relevant factor, whether "[t]he employer can discharge the worker," clearly militates against finding otherwise. See id. It is undisputed that the superintendent of Lynn's public school system, and not the mayor, had the ultimate authority to hire and fire school athletic coaches. The mayor's lack of hiring and firing authority is

particularly clear in this case, where Clancy's letters strongly urged Superintendent Kostan and Principal Fila to rescind Barton's appointment, but Kostan and Fila rejected that suggestion and kept Barton employed. Barton has not attempted to demonstrate, and the record does not show, that any of the other factors listed in the EEOC guidelines support a finding that the City's public high school athletic coaches are "employees" of the mayor.

Barton does not argue that Clancy qualified as his employer based on the factors listed in the EEOC guidelines. Instead, he relies on our decision in Carparts Distribution Center, Inc. v. Automotive Wholesaler's Ass'n of New England, Inc., 37 F.3d 12 (1st Cir. 1994), and argues that Clancy was his employer because Clancy had the ability to control significant aspects of Barton's employment. In Carparts, we stated that an entity would be an "employer" under the Americans with Disabilities Act (ADA) if it "exercised control over an important aspect of [the plaintiff's] employment," such as employee health care coverage. Id. at 17. In Lopez, however, we emphasized that the Supreme Court has restricted the definition of "employer" under Title VII to its meaning at common law. 588 F.3d at 84. We distinguished Carparts on the grounds that it "involved two private entities, an unusual set of facts, and a particular procedural posture," and noted that in Carparts we ultimately "concluded that we lacked sufficient facts

to determine whether this test even applied to the case at hand." Id. at 88 (citing Carparts, 37 F.3d at 18).

Even assuming, arguendo, that the standard suggested in Carparts is applicable here, Clancy did not exercise sufficient control over any important aspect of Barton's employment to qualify as his employer. Barton emphasizes ways in which the mayor exercised some indirect influence over the hiring and financing of high school basketball coaches. Under the Lynn City Charter and state law, the mayor sits as chairman of the School Committee; the School Committee in turn has the authority to elect the superintendent; and the superintendent, in consultation with high school principals, in turn has the authority to hire and fire school athletic coaches, Mass. Gen. Laws ch. 71 §§ 47A, 59B. The mayor also has some influence over public school funding. Under the City Charter, the mayor submits a proposed budget to the City Council for each fiscal year, which contains a complete financial plan for all city funds and activities. The City Council then adopts the budget, with or without amendments. However, as noted above, it is undisputed that the superintendent, not the mayor, has authority to hire and fire athletic coaches. The mayor's limited and indirect influence over public school athletic coaches does not indicate that Mayor Clancy exercised control over an important aspect of Barton's employment.

2.  Whether § 4(4A) Requires An Employment Relationship

Barton next contends that even if Clancy was not his employer, his handicap harassment claim can proceed against a person other than his employer under ch. 151B, § 4(4A).  Section 4(4A) provides that it is unlawful

> [f]or any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter.

Barton reasons that § 4(4A) prohibits "any person," regardless of whether that person is his employer, from interfering with his enjoyment of a right protected by ch. 151B.  He contends that Clancy's conduct interfered with his enjoyment of the protected right to work in an environment free from unlawful handicap harassment.  See ch. 151B, § 4(16) (prohibiting employment discrimination based on handicap).[7]

The SJC has not directly addressed the issue of whether a defendant may be held liable under § 4(4A) for interfering with

_____

[7] The SJC has not specifically confirmed that Massachusetts recognizes a claim for a hostile work environment based on handicap under ch. 151B, § 4(16).  However, the parties do not dispute that Massachusetts recognizes such a claim, and we proceed on the assumption that such a claim is cognizable under ch. 151B, § 4(16). See Quiles-Quiles v. Henderson, 439 F.3d 1, 5 & n.1 (1st Cir. 2006) (assuming that a disability harassment claim is viable under analogous provision of the ADA).

-21-

a plaintiff's protected right to work in an environment free of unlawful harassment, even where the defendant is not the plaintiff's employer or employer-agent. However, Barton's reading of § 4(4A) finds limited support in Massachusetts case law and administrative MCAD decisions.[8]  See, e.g., Thomas O'Connor Constructors, Inc. v. Mass. Comm'n Against Discrimination, 893 N.E.2d 80, 86-89 (Mass. App. Ct. 2008) (imposing liability under § 4(4A) on a general contractor for its supervisory employee's racial harassment of plaintiff construction worker at the "unitary" construction work site, even though neither the alleged harasser nor the general contractor were plaintiff's employer); Mass. Comm'n Against Discrimination v. Local Union No. 12004 ("McGrath"), 2004 WL 1852966, at *37 (MCAD 2004) (imposing individual liability on union employees for sexual orientation harassment of supervisory employee at company work sites, reasoning that liability is properly imposed under § 4(4A) even "when the person charged with employment discrimination is not the complainant's employer or an agent of the employer"); Fluet v. Harvard Univ., 2001 WL 1602815, at *41 (MCAD 2001) (imposing individual liability on professor for sexual harassment of teaching assistant under § 4(4A) absent an employment relationship); Erewa v. Reis, 20 MDLR 36 (MCAD 1998) (holding that an elderly patient's niece could be held liable under

---

[8] Administrative decisions of the MCAD are to be accorded deference in the interpretation of ch. 151B. College-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination, 508 N.E.2d 587, 593 (Mass. 1987)

§ 4(4A) for racially harassing a home health care worker in the patient's home, reasoning that the plain language of § 4(4A) does not require any employment relationship).

Even assuming, arguendo, that Clancy may be held liable absent an employment relationship, the question remains whether Clancy's alleged conduct interfered with Barton's right to work in an environment free of unlawful harassment.[9]

## C. Whether Clancy Interfered With a Protected Right Under Ch. 151B

Clancy contends that even if a direct employment relationship is not required to impose liability under § 4(4A), his conduct did not interfere with Barton's protected right to work in an environment free of unlawful harassment. Clancy emphasizes that he and Barton did not work at the same site and that he was never physically present at Barton's workplace.

As discussed above, in certain factual circumstances, the MCAD and at least one Massachusetts appellate decision have interpreted § 4(4A) to impose liability on "any person" for interference with the plaintiff's right to work in an environment free of unlawful harassment, even where that person is not the

---

[9] Barton also suggests that Clancy violated a right protected by ch. 151B in that he "attempted to interfere" with Barton's employment as basketball coach by attempting to have him discharged. However, Clancy was ultimately unsuccessful in convincing Superintendent Kostan or Principal Fila to discharge Barton. Nothing in § 4(4A) suggests that a defendant may be held liable under this section for merely attempting, without success, to interfere with a right protected by ch. 151B, and Barton cites no authority for this interpretation.

plaintiff's employer or employer-agent. However, in each of these decisions the alleged harasser was physically present at the plaintiff's workplace and the harassing conduct occurred on the plaintiff's work site during the work day. See, e.g., Thomas O'Connor Constructors, 893 N.E.2d at 89 (verbal harassment of construction worker by supervisory employee of general contractor on "unitary work site"); McGrath, 2004 WL 1852966 at *37 (verbal harassment of supervisory employee by union employees at gas company dig sites); Erewa, 20 MDLR at 38 (verbal and physical harassment of home health care worker during on-site visit to patient's home).

Here, by contrast, Clancy was never physically present at Barton's work site and none of the alleged harassing conduct occurred at Barton's workplace, although Barton may have felt some of the effects of that conduct at work. Clancy never visited Barton's office while he was the basketball coach, never attended any of his basketball games or practices, and was never otherwise physically close to Barton while Barton was working as a basketball coach. Clancy also never personally confronted Barton during the time he served as coach and never spoke directly with Barton about the basketball coaching position.

Barton does not cite, and we are not aware of, any Massachusetts decisions imposing liability for harassment under § 4(4A) where, as here, the alleged harasser was not the

plaintiff's employer or employer-agent, was never physically present at the plaintiff's work site, and did not perform any of the alleged harassing acts on the plaintiff's work site. As a federal court applying the law of the forum state, "we will not create new rules or significantly expand existing rules. We leave those tasks to the state courts." Phoung Luc v. Wyndham Mgmt. Corp., 496 F.3d 85, 88 (1st Cir. 2007). In light of our conclusion, we need not address Clancy's alternate argument that his actions were not sufficiently severe or pervasive to create a hostile work environment.

## III.

Barton next contends that the district court erroneously concluded that his First Amendment claim was barred by qualified immunity. Barton claims that Clancy retaliated against him based on the exercise of his First Amendment rights in violation of clearly established law. Clancy's First Amendment claim is based on two different alleged acts of retaliation: (1) Clancy's decision not to reappoint Barton to his position on the Lynn Parks Commission in April 2006, and (2) Clancy's campaign of harassment against Barton in 2006-2007 following his appointment as basketball coach. We discuss the qualified immunity framework, and then address each component of Barton's retaliation claim.

## A. Qualified Immunity Analysis

Public officials have "qualified immunity from personal liability for actions taken while performing discretionary functions." Lynch v. City of Boston, 180 F.3d 1, 13 (1st Cir. 1999). The qualified immunity analysis requires a court to decide "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (adopting two-step analysis and abandoning prior usage of three-step analysis in light of Pearson v. Callahan, 129 S. Ct 808, 815-16 (2009)). Courts may conduct this inquiry sequentially, or resolve a particular case on the second prong alone. Id. at 270.

The "clearly established" prong has two aspects: (1) "the clarity of the law at the time of the alleged civil rights violation," and (2) whether, given the facts of the particular case, "a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights." Id. at 269. "Cognizant of both the contours of the allegedly infringed right and the particular facts of the case, the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id.

(internal quotation marks and citation omitted).  In other words, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional."  Id.  This does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," but rather that "in the light of pre-existing law the unlawfulness must be apparent."  Anderson v. Creighton, 483 U.S. 635, 640 (1987); accord Hope v. Pelzer, 536 U.S. 730, 739 (2002); Bergeron v. Cabral, 560 F.3d 1, 12 (1st Cir. 2009), abrogated on other grounds by Maldonado, 568 F.3d at 269 ("[A] plaintiff need not show that the conduct of which he complains is an exact replica of conduct that previously has been held unlawful.").

In conducting a qualified immunity analysis, a court should "use its full knowledge of its own [and other relevant] precedents."  Elder v. Holloway, 510 U.S. 510, 516 (1994) (internal quotation marks omitted, brackets in original).  The court must examine whether there are "'cases of controlling authority . . . at the time of the incident . . . [or] a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful,'" Bergeron, 560 F.3d at 11 (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)) (alterations in original), and "should search the relevant authorities both in circuit and out of circuit."  Id.; see also El Dia, Inc. v.

-27-

Rossello, 165 F.3d 106, 110 n.3 (1st Cir. 1999) (declining to adopt "a hard-and-fast rule" that out-of-circuit precedent is either determinative of or irrelevant to whether a law is clearly established, and instead stating that whether precedent "clearly establishes" a law may depend in part upon "the location and level of the precedent, its date, its persuasive force, and its level of factual similarity to the facts before this Court").

**B. Non-Reappointment to Parks Commission**

Barton contends that Clancy violated clearly established law by declining to reappoint him to the Lynn Parks Commission in retaliation for the exercise of his First Amendment rights. Clancy responds that it is not unlawful to decline to reappoint an individual to a public volunteer position in retaliation for protected activity, and that in any event he is entitled to qualified immunity because the law was not clearly established as of April 10, 2006, when the non-reappointment occurred. To assess this response, we first survey the state of the relevant law on (1) whether removal from a volunteer position such as Parks Commissioner triggers First Amendment scrutiny, and (2) whether the failure to reappoint to a volunteer position, as opposed to removal from such a position, triggers such scrutiny. We then evaluate whether the right at issue was clearly established in April 2006.

1. Law on Removal from a Volunteer Position

"Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." Powell v. Alexander, 391 F.3d 1, 16-17 (1st Cir. 2004) (internal quotation marks omitted). As a general matter, the government may not deprive an individual of a "valuable government benefit[]" in retaliation for his or her exercise of First Amendment rights.[10] Lynch, 180 F.3d at 13-14. In Perry v. Sindermann, 408 U.S. 593, 597 (1972), the Supreme Court explained:

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests – especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.

Clancy does not dispute this general principle, but instead contends that a volunteer position, such as that of Parks Commissioner, is not a "valuable governmental benefit," the deprivation of which would trigger First Amendment scrutiny.

---

[10] Clancy does not contend that Barton did not engage in protected activity, or that the non-reappointment was not in retaliation for his protected activity, and therefore we do not address these issues.

-29-

Clancy relies heavily on Lynch, in which we held that, as of August 1994, it was not clearly established that it was unlawful for a government official to remove an individual from a volunteer position in retaliation for protected speech. 180 F.3d at 13. The plaintiff claimed that she was terminated from service as a volunteer on the mayor's Hunger Commission in retaliation for her exercise of First Amendment rights. Id. at 6, 13. We first "assume[d], without deciding, that the opportunity to serve as a volunteer could constitute the type of valuable governmental benefit or privilege the deprivation of which can trigger First Amendment scrutiny." Id. at 13 (citing Perry, 408 U.S. at 597). We then reasoned that even if removal from a volunteer position in retaliation for protected activity violated the First Amendment, it was not a violation of clearly established law:

> It was not "clearly established" as of August, 1994, when [the supervisor] removed [the plaintiff] from the Hunger Commission, that a government official could not take such action in retaliation for protected speech. We recognize that the Supreme Court has held that a variety of public benefits, in addition to public employment, cannot be denied solely because of the recipient's exercise of constitutional rights. See, e.g., Rutan v. Republican Party, 497 U.S. 62 (1990) (promotion or transfer in government job); Shapiro v. Thompson, 394 U.S. 618, 627 n.6 (1969) (welfare benefits). [The plaintiff] argues that loss of a volunteer position with a government agency falls into this category. However, neither the Supreme Court nor this court has ever held that the rule forbidding denial of valuable governmental benefits in reprisal for protected speech announced in

-30-

> Perry v. Sindermann and its progeny extends to the denial of non-compensated positions on voluntary boards. Scant authority in support of such an extension of the doctrine currently exists.

Id. at 13-14. We acknowledged that in Hyland v. Wonder, 972 F.2d 1129, 1135 (9th Cir. 1992) ("Hyland I"), the Ninth Circuit held "that volunteer status is a valuable governmental privilege that cannot be denied on the basis of protected speech." Lynch, 180 F.3d at 14. However, we concluded that a single decision from another circuit applying its own precedents was insufficient to make it apparent to a reasonable public official that a particular act was unlawful. Id.

Between August 1994, when the alleged retaliatory action occurred in Lynch, and April 2006, when the alleged retaliatory action occurred in this case, neither the First Circuit nor the Supreme Court addressed whether removal from a volunteer position in retaliation for protected speech can violate the First Amendment.[11] Relying on decisions from other jurisdictions, Barton argues that the legal landscape has changed since Lynch and that the right he asserts was clearly established at the time of his non-reappointment. We review the relevant out-of-circuit decisions, beginning with the earliest.

---

[11] Ziskend v. O'Leary, 79 F. Supp. 2d 10 (D. Mass. 2000), citing Lynch, held that at the time of the alleged adverse action in that case, October 1997, it was not clearly established that removal from a public volunteer position triggered First Amendment scrutiny. Id. at 12-13.

-31-

Prior to <u>Lynch</u>, a Second Circuit decision, <u>Janusaitis</u> v. <u>Middlebury Volunteer Fire Department</u>, 607 F.2d 17, 25-26 (2d Cir. 1979), found that the dismissal of a volunteer firefighter for certain work-related complaints could violate the First Amendment.[12] In that case, however, it was unnecessary for the court to engage in an analysis of the plaintiff's status because Connecticut law specifically provided that "volunteer firemen 'shall be construed to be employees of the municipality' for purposes of workmen's compensation." <u>Id.</u> at 21 (<u>quoting</u> Conn. Gen. Stat. § 7-314a). Therefore, after concluding that the termination of the firefighter was "state action" for purposes of a § 1983 claim, the court simply treated the firefighter as a public employee for purposes of the First Amendment claim. <u>Id.</u> at 25.[13]

More than a decade later in <u>Hyland I</u>, the Ninth Circuit held that "the loss of a high-level volunteer position" with the city Juvenile Probation Department could trigger First Amendment

---

[12] The court ultimately concluded that no First Amendment violation had occurred because the plaintiff had expressed himself in a way that threatened the fire department's institutional efficiency.

[13] <u>Janusaitis</u> does not appear to reflect the prevailing view of the Second Circuit. A far more recent decision stated, without citation to <u>Janusaitis</u>, that the Second Circuit "had not yet addressed whether 'claims of termination from volunteer positions based on protected conduct are equivalent to, or should be analyzed different from, more traditional claims of termination from salaried government positions.'" <u>Hoyt</u> v. <u>Andreucci</u>, 433 F.3d 320, 327 n.5 (2d Cir. 2006) (<u>quoting</u> <u>Gorman-Bakos</u> v. <u>Cornell Coop.</u> <u>Extension of Schenectady Cnty.</u>, 252 F.3d 545, 551 n.2 (2d Cir. 2001)).

scrutiny. 972 F.2d at 1136. As noted, we concluded in Lynch that Hyland I, a single circuit decision applying its own precedents, did not suffice to clearly establish the right at issue. In addition, both that case and its sequel, Hyland v. Wonder, 117 F.3d 405 (9th Cir. 1997) ("Hyland II"),[14] relied in part on Janusaitis. Neither Hyland decision considered the fact that in Janusaitis, unlike in Hyland, state law required that the volunteer position at issue be treated as equivalent to public employment for certain purposes.

Between the two Hyland decisions, in Versarge v. Township of Clinton, 984 F.2d 1359 (3d Cir. 1993), the Third Circuit "assume[d], without deciding, that 'the opportunity to serve as a volunteer [firefighter] constitutes the type of governmental benefit or privilege the deprivation of which can trigger First Amendment scrutiny.'" Id. at 1364 (quoting Hyland, 972 F.2d at 1135).

Several years later, in Andersen v. McCotter, 100 F.3d 723, 727 (10th Cir. 1996), the Tenth Circuit held that an intern terminated from her position at a community corrections facility was entitled to First Amendment protection. While the court ultimately concluded that the plaintiff was an employee, it also stated that her claim would not be defeated even if she were

---

[14] Hyland I found that the loss of a volunteer position was protected; Hyland II found that the right was clearly established in 1988, when the plaintiff was terminated.

considered to be a volunteer.  Id.  Because it found the plaintiff to be an employee, the court declined to decide whether it was clearly established, as of March 1994, that volunteers were entitled to First Amendment protection.  Id. at 729.[15]  Instead, the court relied on the unremarkable proposition that it had been clearly established since 1968 that public employees were entitled to such protection.  Id.  Most recently, in Mosely v. Board of Educaction of Chicago, 434 F.3d 527 (7th Cir. 2006), the Seventh Circuit found that the plaintiff stated a First Amendment claim when she alleged that she had been denied the opportunity to meaningfully participate in her role as a school committee volunteer in retaliation for her protected activity.  That case, however, relied in part on another Seventh Circuit case which, like Janusaitis, concluded that a volunteer firefighter could be protected by the First Amendment based in part on a state statute that treated volunteer firefighters as employees under the law.  Mosely, 434 F.3d at 535 (citing Brown v. Disciplinary Comm. of Edgerton Volunteer Fire Dep't, 97 F.3d 969, 973-74 (7th Cir. 1996)).[16]

_____

[15] Although the court did not decide the issue, it did cite Hyland I and Janusaitis after noting the defendants' argument that volunteer protection was not clearly established.

[16] Because the court was deciding a motion to dismiss for failure to state a claim, neither a qualified immunity defense nor its "clearly established law" component was at issue.

-34-

In sum, the Second, Seventh, and Ninth Circuits have found that volunteer positions are entitled to constitutional protection; however, these cases have relied in part, either directly or indirectly, on state statutes which mandate that such volunteers be treated as employees. The Tenth Circuit, albeit in dicta, has concluded that volunteers enjoy First Amendment protection without reliance on any such state statute. The Third Circuit, like this circuit, has assumed without deciding that a public volunteer position is a valuable government benefit, the deprivation of which can trigger First Amendment scrutiny. At the same time, no court has held that volunteers are not protected by the First Amendment.

2. Law on Removal Versus Non-Reappointment

Whether volunteers are entitled to First Amendment protection is only part of the equation. Clancy further argues that, even if it was clearly established as of April 2006 that removal from a public volunteer position triggers First Amendment scrutiny, it was not clearly established that failure to reappoint to a volunteer position triggers such scrutiny.

Strictly speaking, Clancy is correct. Although a number of courts have subjected volunteer positions to First Amendment scrutiny, those decisions have addressed removal from a volunteer position, rather than non-reappointment to it. At the same time, however, this distinction between removal and failure to reappoint

-35-

has been considered immaterial in cases where the plaintiff, unlike Barton, is a public employee.

A plaintiff's lack of any right or entitlement to employment does not defeat a First Amendment retaliation claim based on denial of that employment. Perry, 408 U.S. at 597. In Perry, the Supreme Court held that the nonrenewal of a nontenured state college teacher's contract at the end of his one-year contract triggered First Amendment scrutiny. The Court explained that even if the plaintiff had no right to a valuable government benefit, that benefit could not be denied simply because of his protected speech. Id. Thus, the plaintiff's "lack of a contractual or tenure 'right' to re-employment" was "immaterial to his free speech claim." Id. at 597-98. The Court drew a distinction between the plaintiff's First Amendment retaliation claim, in which his lack of any entitlement or property interest in his continued employment was "irrelevant," and his procedural due process claim, in which those facts were "highly relevant." Id. at 599; accord Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977).

Applying these principles, we have held that because a First Amendment claim does not depend on any right or entitlement to continued employment, First Amendment protections apply with equal force whether the public employee is terminated from a position or not reappointed. See, e.g., Ward v. Hickey, 996 F.2d

-36-

448, 452 (1st Cir. 1993) ("In general, as [plaintiff] was a nontenured teacher the School Committee could have refused to rehire her without any reason at all. However, a school committee violates the First Amendment . . . if it denies rehiring in retaliation for a nontenured teacher's exercise of constitutionally protected speech." (internal citations omitted)); Cheveras Pacheco v. Rivera Gonzalez, 809 F.2d 125, 128 (1st Cir. 1987) (holding that First Amendment protections against loss of employment based on political affiliation "apply generally to an employee's right to retain his public employment, and they do not distinguish between employees discharged from a permanent position and those who fail to receive a new appointment" (emphasis in original)).

3. Clearly Established Law

Leaving for another day the question of whether Barton has stated a constitutional violation, we hold that as of April 2006, the law was not sufficiently clear to put Clancy on notice that declining to reappoint Barton to the volunteer position of Parks Commissioner in retaliation for his First Amendment activities was unlawful.

First, it was not clearly established that the loss of an unpaid volunteer position could form the basis of a First Amendment retaliation claim. Neither this circuit nor the Supreme Court has resolved the basic question of whether an unpaid volunteer position is a valuable government benefit, the deprivation of which can

trigger First Amendment scrutiny. Although several decisions from other jurisdictions have subjected volunteer positions to such scrutiny, some did so in direct or indirect reliance on state statutes that treat volunteers as employees. Others did so only in dicta, and still others assumed this principle without deciding it. This collection of precedent hardly amounts to the type of "consensus . . . of persuasive authority" that would preclude a misunderstanding as to the legality of non-reappointment of a volunteer. Bergeron, 560 F.3d at 11.

Second, we are not aware of any cases holding or even assuming that non-reappointment to a volunteer limited-term position triggers First Amendment scrutiny. Although the proscription on refusing to reappoint employees in retaliation for engaging in protected speech was clearly established in 2006, it does not necessarily follow that the failure to reappoint a volunteer to a term position in retaliation for engaging in protected speech was also clearly prohibited.

In sum, determining whether Clancy was liable for his failure to reappoint Barton would require us to answer two uncertain legal questions: (1) whether a volunteer position is a valuable government benefit the loss of which can form the basis of a First Amendment retaliation claim; and (2) whether, even if the removal from a volunteer position triggers First Amendment scrutiny, the failure to reappoint to a volunteer term position can

also trigger such scrutiny. Consequently, the dimensions of the right at issue were far from "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640.

## C. Campaign of Retaliatory Harassment

Barton further contends that Clancy violated clearly established law by conducting a campaign of harassment against him in retaliation for his protected activity. Barton's claim of retaliatory harassment is based on substantially the same facts as his handicap harassment claim: Clancy's statements conveying his disapproval of Barton being hired as the basketball coach and Clancy's investigation into Barton's tax records and pension.[17]

We first survey the law relevant to Barton's claim of retaliatory harassment before assessing the claim itself.

---

[17] Clancy suggests in his brief on appeal that Barton's retaliation claim in the district court was based only on the non-reappointment to the Lynn Parks Commission, and not on the alleged campaign of harassment. This contention is not supported by the record. Barton's complaint alleged that Clancy took a series of actions against Barton, including both the non-reappointment to the Parks Commission and the acts of harassment set forth above, and then broadly alleged that "the conduct of defendant Clancy, as set forth above, constitutes a violation of plaintiff's rights to freedom of speech . . . ." In his opposition to Clancy's motion for summary judgment, Barton specifically argued that Clancy retaliated against him by "engag[ing] in a relentless public campaign to oust Mr. Barton from his job as basketball coach" and by requesting records related to Barton's taxes and disability pension. Clancy responded to this argument in his reply brief.

1. Law on Retaliatory Harassment

Public employees "do not forego all the protections of the First Amendment by virtue of working for the government." Foley v. Town of Randolph, 598 F.3d 1, 5 (1st Cir. 2010). The Supreme Court's jurisprudence has long protected the First Amendment rights "not only of the employees themselves, but of the general public in receiving the well-informed views of government employees engaging in civic discussion." Id. (internal quotation marks omitted). In evaluating whether a challenged government action violates a public employee's First Amendment right to freedom of speech, we examine (1) "'whether the employee spoke as a citizen on a matter of public concern,'" (2) "'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public,'" and (3) "whether the plaintiff can show that the protected expression was a substantial or motivating factor in the adverse employment decision." Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).

Clancy does not argue that Barton did not speak as a citizen on matters of public concern, that the government had an adequate justification for its treatment of Barton, or that Barton's protected speech was not a substantial or motivating factor in the alleged harassment. Indeed, the district court

-40-

reached conclusions in Barton's favor on each of these issues,[18] and Clancy does not dispute those determinations. Therefore, we do not address these issues on appeal.

### a. Employment Relationship

Clancy first argues, without citation to authority, that there can be no constitutional violation in the absence of an employer-employee relationship with Barton for purposes of the coaching position. As discussed above, Clancy did not exercise sufficient control over Barton's employment as a high school basketball coach to qualify as his "employer" for purposes of Massachusetts's antidiscrimination law. However, the fact that Clancy was not Barton's employer for purposes of employment discrimination law does not foreclose Barton's First Amendment retaliation claim.

A traditional employment relationship is not a prerequisite to a First Amendment retaliation claim. Official retaliation is actionable because it "tend[s] to chill individuals' exercise of constitutional rights." Powell, 391 F.3d at 17

---

[18]The district court stated:

Plaintiff's allegations, if true, establish a constitutional violation. . . . Plaintiff has produced facts tending to show that (1) he engaged in speech on matters of public concern; (2) his interest in speaking, and the public's interest, outweighed any legitimate governmental interest in the efficient performance of its public function; and (3) the speech was a motivating factor in Defendant's alleged retaliation.

-41-

(quotation marks omitted); see also Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998) ("The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right."). Government actions that threaten to chill protected activity can occur in a variety of factual contexts and are not limited to cases in which the government actor is the plaintiff's employer. See, e.g., Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 674 (1996) (holding that First Amendment protections apply to government contractors as well as government employees, noting that in either case government efforts "may chill speech on matters of public concern"). Indeed, actionable retaliation may occur outside the employment context altogether. See, e.g., El Dia, Inc., 165 F.3d at 109-10 (retaliatory withdrawal of government advertising from newspaper infringes on First Amendment rights); Nestor Colón-Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 40-41 (1st Cir. 1992) (retaliatory denial of land use permit violates First Amendment).

b. Adverse Employment Action

Clancy further contends that "Barton's inability to show a tangible adverse employment action is fatal to his First Amendment claim." Clancy emphasizes that Barton has not alleged specific changes in his working conditions such as the loss of a promotion.

For purposes of a First Amendment retaliation claim, even in an employment setting, a plaintiff need not suffer an "adverse employment action" as that term ordinarily is used in the employment discrimination context. The term "adverse employment action" first developed in the Title VII context "as a shorthand for the statutory requirement that a plaintiff show an alteration in the material terms or conditions of his employment." Bergeron, 560 F.3d at 7-8 (emphasis added). However, there is no similar requirement for a First Amendment claim filed pursuant to § 1983. See id. at 8. Instead, "the 'adverse employment action' inquiry in the section 1983 context focuses on whether an employer's acts, viewed objectively, place substantial pressure on the employee's political views" – or, more generally, on whether the defendants' acts would have a chilling effect on the employee's exercise of First Amendment rights.[19] Id. at 8 (citing Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1218 (1st Cir. 1989) (en banc)); see also Rivera-Jiménez v. Pierluisi, 362 F.3d 87, 94 (1st Cir. 2004) ("[T]he standard for showing an adverse employment action is lower in the First Amendment retaliation context than it is in other contexts (such as Title VII) . . . .").

_____

[19] Our precedent derives primarily from the employment setting, and the standards are thus typically articulated for that context. However, as we have observed, the First Amendment principles also are applicable where the plaintiff is not in an employment relationship with the defendant. This case is something of a hybrid. Clancy was not Barton's employer, but his actions targeted Barton's public employment.

-43-

Thus, the pertinent question in a § 1983 retaliation case based on the First Amendment is whether the defendant's actions would deter "a reasonably hardy individual[]" from exercising his constitutional rights. Agosto-de-Feliciano, 889 F.2d at 1217. A campaign of informal harassment, for example, would support a First Amendment retaliation claim if the alleged harassment would have such a chilling effect. See id. (informal harassment short of actual or constructive discharge can support § 1983 retaliation claim if "government's actions are sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations"); accord Martinez-Vélez v. Rey-Hernández, 506 F.3d 32, 42 (1st Cir. 2007) (same); see also Rosario-Urdaz v. Velazco, 433 F.3d 174, 179 (1st Cir. 2006) (stating that a "substantial campaign of harassment, instigated or knowingly tolerated by superiors," can form the basis for a § 1983 claim).

Even "relatively minor events" can give rise to § 1983 liability, Rivera-Jiménez, 362 F.3d at 94, so long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights. See id. at 94-95 (retaliatory harassment of plaintiff, including denial of special benefits and assignments, was sufficiently adverse to form basis for First Amendment claim); see also, e.g., Coszalter v. City of Salem, 320 F.3d 968, 976-77 (9th Cir. 2003) (campaign of

-44-

retaliatory acts, including disciplinary investigation, change in duties, and verbal harassment and humiliation, was sufficient to support First Amendment claim); Pieczynski v. Duffy, 875 F.2d 1331, 1335-36 (7th Cir. 1989) (campaign of minor harassments, including removing plaintiff's long distance phone line, denying requests for vacation time, confining duties to paperwork, and not allowing her to change lunch hour, was sufficient to support First Amendment claim); Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982) ("campaign of petty harassments," including groundless reprimands of plaintiff and holding her up to ridicule for bringing a birthday cake to the office, supported First Amendment claim).  But see McKee v. Hart, 436 F.3d 165, 170-71 (3d Cir. 2006) (three comments by supervisor that were critical of plaintiff's job performance, without more, were too trivial to deter a person of ordinary firmness from exercising First Amendment rights).

2. Clearly Established Law

We have no difficulty concluding that "the contours of the allegedly infringed right," Maldonado, 568 F.3d at 269, were clearly established at the time of Clancy's actions in 2006 and 2007.  Precedents from this court and the Supreme Court demonstrated that a First Amendment retaliation claim requires neither a formal employment relationship, see Umbehr, 518 U.S. at 674, nor an "adverse employment action" as that term is used in Title VII, see Rivera-Jiménez, 362 F.3d at 94.  Moreover, we had

-45-

held that even "relatively minor events" can give rise to liability for retaliation under § 1983, see id., and that a campaign of harassment can support a First Amendment retaliation claim if the harassment would deter a reasonably hardy individual in the exercise of his or her First Amendment rights, see, e.g., Rosario-Urdaz, 433 F.3d at 179; Agosto-de-Feliciano, 889 F.2d at 1217.

Given the facts of this case, however, we need not decide whether Clancy's conduct amounted to unconstitutional retaliation based on these established principles. Rather, because we conclude that Clancy lacked "fair warning that his particular conduct was unconstitutional," Maldonado, 568 F.3d at 269, we hold that Clancy is entitled to qualified immunity.[20]

For the most part, Clancy's statements consisted of substantively appropriate speech criticizing the decision to hire Barton as a city-employed coach while he was receiving a disability pension from the City. In his letters, Clancy invoked "the financial interests of the City of Lynn" and "the skyrocketing increases in pension costs" that were "put[ting] a strain on municipal budgets and the City of Lynn's tax rate." He also asked to review public documents related to Barton's pension and payment of taxes.

---

[20] To be clear, aside from this holding, we are not intimating anything about the constitutionality of Clancy's conduct.

In essence, Clancy instigated a public controversy about an unusual hiring decision that had larger policy implications. Given Clancy's focus on that decision, the legitimate fiscal-responsibility thrust of his commentary, and the limited nature of his records inquiry, it is far from clear that Clancy's actions were sufficiently oppressive to chill the speech of a reasonably hardy individual. In these particular circumstances, we cannot say that a reasonable official in Clancy's "shoes 'would have understood that his conduct violated the Plaintiff['s] constitutional rights.'" Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010) (quoting Maldonado, 568 F.3d at 269) (alteration in original). Accordingly, Clancy is entitled to qualified immunity on Barton's retaliation claim.

**IV.**

For the reasons expressed in this opinion, the district court's grant of summary judgment is affirmed. The parties shall bear their own costs on appeal.

So ordered.